Joseph COLLINS, Petitioner,

v.

Walter FOGG, Superintendent, Greenhaven Correctional Facility, Respondent.

No. 76 C 1840.

United States District Court,
E. D. New York.

Jan. 28, 1977.

James J. McDonough, Legal Aid Society of Nassau County, Mineola, N. Y., for petitioner; Susan M. Kane, student intern, Matthew Muraskin, Legal Aid Society of Nassau County, Mineola, N. Y., of counsel.

Denis Dillon, Dist. Atty., Nassau County, Mineola, N. Y., for respondent; William C. Donnino, Anthony J. Girese, Asst. Dist. Attys., Nassau County, Mineola, N. Y., of counsel.

## MEMORANDUM AND ORDER

PLATT, District Judge.

By a petition for a writ of *habeas corpus*, Joseph Collins challenges his conviction for Rape in the Third Degree and Assault in the Third Degree imposed upon him after a jury trial in the Nassau County Court in violation of Title 28 U.S.C. § 2241 *et seq.*

The following findings of fact were made by the County Court. Eugenia Kusky was using the facilities of a laundromat in Freeport, New York, when she saw a man whom she later identified as the petitioner herein looking through the glass front of the store. The man entered the laundromat, placed his arm around her, and when she resisted his advances, pushed her to the back of the store and repeatedly "stomped" on her with heavy, three inch heeled, white boots. Miss Kusky was then dragged out of the laun-

dromat to a lot behind the store and raped. Shortly after the crime, two police officers arrived and found the victim who gave them a detailed description of her assailant. Three to four minutes later, one of the officers arrested the petitioner who was one and one-half blocks from the scene of the crime and running in an easterly direction carrying a pair of blood stained white boots. The petitioner was arrested, advised of his *Miranda* rights and immediately identified by Miss Kusky. He was taken to the Freeport police station at approximately 5:50 A.M. where his clothes were removed and he was supplied with other clothing. At approximately 7:25 A.M., the petitioner was taken to the Baldwin Precinct where he was advised several more times of his *Miranda* rights and questioned. He made no inculpatory statements. At approximately 9:30 A.M., Detective Morrissey advised the petitioner of his *Miranda* rights, and spoke to him about his belief in God. The petitioner then made the first of two confessions which was reduced to writing, signed by the petitioner, and witnessed by two officers. A second confession was made at approximately 12:30 P.M. which paralleled the earlier one in every respect, except that in the second confession the petitioner admitted that he had not visited his girlfriend prior to going to the laundromat as he had claimed in his first confession. At approximately 2:44 P.M. the petitioner was taken to the Mineola Police Headquarters where he was photographed and fingerprinted. In response to a question from a desk officer, he alleged for the first time that he had been beaten and kicked by the police and asked to see a doctor. At approximately 4:00 P.M., the petitioner was taken to the Nassau County Medical Center and examined by Dr. Firoozi. The only evidence of a beating found by the doctor was a small abrasion over the petitioner's left eye and numerous red blood cells in his urine.

The petitioner's account of the events leading up to his confessions differed sharply from the other testimony. He claimed that after his arrest he was placed in the front seat of the arresting officer's car, who was alone at the time, and was beaten over the top and back of his head with a blackjack which "busted" his nose, caused him to bleed, and injured his *right* eye. The petitioner further claimed that he was never taken to the Freeport police station, that he was repeatedly beaten during the day of his arrest, both in the stationhouses and at the hospital by several police officers including a "tall blonde individual", and that he requested but was denied the assistance of counsel.

The State Court found that the testimony of the police officers who arrested and interrogated the petitioner was credible, and that the petitioner was not beaten or coerced into confessing. Specifically, the Court found that there were no "tall blonde cops" who beat the petitioner since there were no policemen fitting that description on the force, that the petitioner's claim that he was beaten in a police car and the stationhouses was incredible in that the only medical evidence of injury was a small cut over the petitioner's *left* eye and a high red blood cell count in his urine. The Court found that the cut must have occurred after the confessions were given since no such injury was visible in a mug shot taken at 3:30 that afternoon, and that the high red blood cell count in the urine was explainable as either a side effect from a recent operation, a result of the violence during the commission of the crime, or a result of the petitioner's own "thrashing about" in the police station. The Court also relied on the clarity of the petitioner's signature on the confession in concluding that he had not been beaten by the police. Furthermore, the Court concluded that on each and every occasion that the petitioner was warned of his constitutional rights he replied that he fully understood them and made a knowing, intelligent, and voluntary waiver of those rights.

The decision of the County Court was affirmed by the Appellate Division, Second Department, on June 2, 1975, and by the New York Court of Appeals on March 25, 1976.

Petitioner argues herein that his confessions should have been suppressed since: (i)

they were a product of police coercion; (ii) he requested but was denied the right to counsel.

## I

█ Petitioner has exhausted his state remedies. The claims raised herein were argued in the petitioner's brief to the State Courts. Title 28 U.S.C. § 2254(b) and (c).

## II

█ Petitioner's first claim was dismissed at oral argument. The Court held that the petitioner had not met his burden of proof by convincing evidence that the factual determination of the State Court that petitioner was not beaten or otherwise coerced into confessing was erroneous. Title 28 U.S.C. § 2254(d); *U. S. ex rel. Stanbridge v. Zelker*, 514 F.2d 45 (2d Cir.), *cert. denied*, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975).

## III

Petitioner's second argument, that he requested but was denied the assistance of counsel, presents a somewhat closer question. Petitioner relies on the testimony of Detective Furno who said that the petitioner asked him if he could recommend an attorney, to which he replied that it would be a Legal Aid or other appointed attorney, but that he could not recommend one. The detective's testimony is reproduced in relevant part in the appendix of this decision.

█ We recognize initially that where interrogation of a defendant occurs without the presence of an attorney and a statement is obtained, a heavy burden rests on the state to show that the defendant knowingly and intelligently waived his right to counsel. *Miranda v. State of Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, we think that the state has satisfied its burden in this case. The testimony of Detective Furno reflects that he made every effort to explain the peti-

tioner's *Miranda* rights to him, including the right to counsel. All told, the petitioner was advised of his rights at least five times following his arrest, including three times after the colloquy relied upon herein.[1]

The pattern here is particularly interesting and significant. The detective advised the defendant "that he didn't have to talk to me, that he could talk to an attorney first," then explained to him what an attorney was, and "Then (the defendant) says, 'Oh, a lawyer? Yes I know what a lawyer is.'" After the detective advised him again of his right to a lawyer before talking to him the defendant changed the subject.

Thereafter the defendant asked "When am I going to be able to make my one phone call?" to which the detective replied "You are entitled to make a phone call and we don't limit you to one" and then asked if he wanted to make a phone call and the defendant said "No".

After all that they went back to a discussion of whether he wanted a lawyer which culminated in the detective's suggestion that Legal Aid might be appointed for him and the defendant's query "Can you recommend one to me" and when the answer to that was "No, we are not allowed to do that", defendant again changed the subject and asked when he was going to get beat up. Thereafter there followed a discussion on this subject.

While we agree that under some circumstances a request for a recommendation of an attorney, taken alone, might require that the police curtail further questioning, viewing the pattern of events in this case we cannot say that the request here was more than one of curious inquiry or that the petitioner's subsequent confessions were obtained in violation of his constitutional rights. This is not a case where the petitioner was faced with "relentless interrogators", nor did his well-being depend "on his submission to a menacing captor's demands". *Cf. United States v. Collins*, 462

---

1. Captions on the two written confessions signed by the petitioner contained the *Miranda* warnings.

F.2d 792, 797 (2d Cir. *en banc*), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972). To the contrary, when viewed in their entirety the testimony of the detective reflects a genuine concern for the protection of the petitioner's rights and the responses of the defendant indicate only a desire to know what the procedure was. There was no affirmative request for an attorney despite the numerous opportunities given to the defendant to make one.

Two State Courts have addressed the precise issue raised by the petitioner herein. In *People v. Superior Court,* 15 Cal.3d 729, 125 Cal.Rptr. 798, 542 P.2d 1390 (1975), *cert. denied,* —— U.S. ——, 97 S.Ct. 58, 50 L.Ed.2d 76, the California Supreme Court held that the defendants' request for a recommendation of an attorney constituted a request for the assistance of counsel and the Court suppressed a confession procured during the subsequent interrogation. The California case is distinguishable from the case at bar. The California Court relied principally on the testimony that the defendants first said either "I guess we need a lawyer" or "Do you think we need a lawyer?"[2] The Deputies answered in the affirmative. Only after this exchange did the defendants request that the deputies recommend an attorney. In the case at bar, on the other hand, the testimony reflects no such preliminary colloquy. Furthermore, the California Deputies told the defendants in that case that they could make the officers' jobs "easy or tough". The Court may well have been concerned that the defendants interpreted that language as a veiled threat by the officers. No such threats were made in the case at bar. Thus, we do not believe that the California case supports the petitioner's position herein.

In *People v. Whitman,* 182 Colo. 6, 510 P.2d 432 (1973), the Colorado Supreme Court held that where a defendant asked an officer how and where he could contact an attorney, it did not constitute a request for counsel. The Court relied on the *pattern* of conduct, especially the fact the petitioner did not pursue the matter.

█ Finally, in *United States v. Bettenhausen,* 499 F.2d 1223 (10th Cir. 1974), a case slightly analogous to the one at bar, the Court held that where a defendant inquired of one Special Agent if he was in trouble and also if he needed a lawyer, it did not constitute a request for the assistance of counsel, thereby cutting off the right of further inquiry. We think that the approach taken by the Tenth Circuit and the Colorado Supreme Court is correct and that the proper inquiry is not whether one statement taken in the abstract constitutes an invocation of one's right to counsel, rather the Court must focus on the pattern of police conduct and "all of the relevant circumstances". *Cf. Brady v. U. S.,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). We agree with the New York Court of Appeals that the testimony concerning the conversations between the petitioner and the police officers, and the two signed confessions support the conclusion that the petitioner voluntarily and intelligently waived his right to the assistance of counsel.

For the foregoing reasons, petitioner's application for a writ of *habeas corpus* must be, and the same hereby is, denied.

### APPENDIX

"I told him, I says, 'I don't know if you have been advised of your rights or not, but I'd like to advise you that you don't have to talk to me,' and then I was looking at him, and I kind of got the impression, the way he was sitting, that he either wasn't paying attention to me or he wasn't understanding what I was telling him. So instead of me taking out the card, which I normally have, and read him the rights, I went into great lengths with him about his rights.

I told him that he didn't have to talk to me, that he could talk to an attorney first, and he looked at me and I says, 'Do you understand me? Do you understand what an attorney is?' And he said, 'Well, I think I do.' And then I says—because I wanted to make sure—I says, 'An attorney is somebody that gives you your legal rights, tells

---

**2.** The record was apparently unclear on this point.

you everything about a court and the case and he helps you.' And I says, 'He is a lawyer.'

Then he says, 'Oh, a lawyer? Yes, I know what a lawyer is.' Then I says, 'You have a right to talk to a lawyer before you talk to me, before you answer any questions; and anything you tell me can and will be used in court against you.' Then he asked me a few things, you know.

Q I beg your pardon, Officer?

A You know, he interrupted at that time and he asked me and said, 'Well, when am I going to be able to make my one phone call?' And I says, 'You are entitled to make a phone call, and we don't limit you to one.' Then he said something like 'All I get is one, right?' And I says, 'No, you can make as many as you like, as long as you don't make a long-distance phone call. There I have to get permission. You want to make a phone call?' 'No,' he says, 'I was just wondering when I was going to be able to make it.'

So then I got back to it and I says, 'Before answering any questions, you can have this attorney present.' In other words, I went back to the rights again. I said, 'You don't have to talk to me and you don't have to give me any statement. You can have a lawyer; and if you can't afford one, then the county will take care of the charge.' He says, 'Okay.' Then at that point I remember taking out the card and I read the rest of it to him.

Q Do you remember what you said, Officer?

A Yes, I read the whole thing at that point. You know, starting from the beginning, telling him he has a right to remain silent, that any statement he does make will be used against him in court; he has the right to talk to an attorney before answering any questions and to have a lawyer present at any time; and if he couldn't afford to hire a lawyer, the county will hire one for him, and he has the right of remaining silent until he has an opportunity of consulting this lawyer.

He then asked me, 'Do you mean they will give me a lawyer?' And I says, 'They will give you a lawyer.' And he says, 'What lawyer?' And I said, 'I don't know, it's up to the county. They will appoint one. Whether it's Legal Aid or another one, I don't know, but they will appoint one.' Then he says, 'Can you recommend one to me?' And I said, 'No, we are not allowed to do that.'

Then he says to me, 'All right, when am I goint to get hit?'

THE COURT: What did you say?

THE WITNESS: He says, 'The last time they beat me up.' I says, 'We don't beat up anybody here. I don't know what you mean by beating up.' I says, 'Here, if you get beat up, we are the ones that get arrested, not you.' And he says, 'Last time they beat me up.' And I says, 'It wasn't in this place, because you never get beat up in here.' And he says, 'No, it wasn't here.'

Then I asked him about going into this, what his involvement was, and he says 'I didn't do anything. I was out with my girlfriend. I was at her house.' He said, 'I was at her house most of the night. I was in bed with her a few times and then, finally, her mother threw me out, and I was walking out,' and he said, 'I was carrying my shoes,' and he says, 'The police came up and they grabbed me and they brought me in here.' I says, 'You are sure you had nothing whatsoever to do with this?' And he said, 'No, nothing.'

Then I remember Detective—to be honest with you, I really don't remember. There were people walking in and out, and I don't remember who said something to him, but somebody said, 'Where are your shoes?' And he says, 'I don't know.' Then I says, 'Is this the way you go out at night with your girl friend, dressed like that?' And he says, 'No.' And then I says, 'Your clothes, you got old clothes and they are all wrinkled and dirty.' And he says, 'They are not my clothes. These are the clothes that they gave me.'

Then Detective Morrissey, I believe, at that point came into the room and was

listening to the conversation. A couple of questions were thrown at him. I don't remember exactly.

Q Who else was there at this time?

A Well, people were walking in and out. I wasn't paying any attention to who really. The only one I can remember there, being there most of the time was Patrolman Parker. I remember people walking out to get coffee. I remember Detective Woessner being there, Detective Morrissey. I remember seeing Detective Mazyck walk in. But as far as anybody questioning, I don't know. I knew a couple of questions were asked of him. I don't really know who asked them.

The next general conversation, I heard a lot of questions being asked of him, and it was Detective Morrissey.

Q Detective Morrissey entered the conversation?

A At one time or another.

Q Do you recall what Detective Morrissey said?

A Well, Detective Morrissey first asked me, 'Did anybody advise this man of his rights?' And I said, 'Yes, I did.' Then he said, 'Well, as a matter of procedure, I am going to advise you again.' And he read something. He read the rights to him off a card.

Wait, I don't think he even had the card. He just did it from memory at that point. That's right. He asked the defendant again what his involvement was, and the defendant said, 'Nothing, I didn't do anything.'

Then Detective Morrissey, I remember asking him, the defendant, something to the effect of 'Are you married?' And he said, 'No.' Then he says, 'Do you have any kids?' And he said, 'No.' And then he said, 'Do you have any sisters or brothers?' And he says, 'Yes, I got a sister'—well, he either said a sister or two sisters. I don't remember at this point.

Then Detective Morrissey, he asked him, 'Would you like something like this to happen to them?' And he bowed his head and he just shook his head and then he mumbled something which I believe was 'No,' but I wasn't positive really what he said.

Detective Morrissey asked him, 'Well, would you like to talk to us or are you ashamed to talk to us?' He said, would you rather talk to one of us?' And the defendant said, 'I don't know what you mean.' And he said, 'Well, would you rather talk to just one of us instead of everybody here?' And he said, 'Yes.'

So Detective Morrissey asked us to leave, and we got up and we did.

Q You left?

A Yes.

Q And you went about other business, is that right?

A Yes, sir.

Q And from that point, when you left that room, until today, have you ever seen this defendant before?

A No, sir."