STATE of Iowa, Appellee,

v.

Kevin Richard JOHNSON, Appellant.

No. 65968.

Supreme Court of Iowa.

April 21, 1982.

Francis C. Hoyt, Jr., Appellate Defender, and Scott D. Rosenberg, Asst. Appellate Defender, for appellant.

Thomas J. Miller, Atty. Gen., Shirley Ann Steffe, Asst. Atty. Gen., and David E. Richter, Pottawattamie County Atty., for appellee.

UHLENHOPP, Justice.

This appeal involves several legal problems which arose in the trial of defendant Kevin Richard Johnson on a first-degree murder charge. The fact finder could find as follows from the evidence.

Kevin Richard Johnson, Jr., whom we will refer to as Kevin, was born on April 20, 1980, to defendant and his wife, Kristi Renee Johnson. The child was healthy at birth and appeared to be in good health when examined by a physician at two weeks of age. He lived with his parents in a duplex at 1526½ North Broadway in Council Bluffs, Iowa. At approximately one and one-half weeks of age, a pattern of abuse of the child emerged, with defendant responsible in most instances. On several occasions abuse was inflicted by Mrs. Johnson at defendant's direction.

On June 29, 1980, when Kevin was two months and nine days of age, defendant and Mrs. Johnson took him to the home of Tammy Logan, who baby-sat with the child that afternoon. Although the child did not appear well, Logan observed no severe head injuries. Defendant picked up Kevin at 5:00 p. m. and returned to the Johnson home. At approximately 6:00 p. m. defendant took the child to a bedroom in the home to place him in his crib. Meanwhile Mrs. Johnson was in the kitchen preparing the evening meal. While defendant was placing the child to bed, Mrs. Johnson heard two loud thumps from the bedroom followed by crying. After a short interval defendant joined his wife in the kitchen and they ate their meal.

At about 10:00 p. m. Mrs. Johnson went to the bedroom to check on Kevin after he failed to awaken for his routine feeding. She discovered that he was not breathing and that his skin was cold and discolored. He was lying face down in his crib with a pillow covering his head. She reported his death to defendant.

Defendant decided not to inform the authorities. He and Mrs. Johnson spent the night discussing methods of disposing of the body, and eventually decided upon burial in a wooded area behind their home.

At approximately 6:00 a. m. on June 30, 1980, Mrs. Johnson prepared Kevin for burial by wrapping his body in two plastic trash bags. Defendant and Mrs. Johnson then took the body and walked to the wooded area. Mrs. Johnson stood guard while defendant entered the woods and buried the child in a makeshift grave. After the burial defendant and Mrs. Johnson moved to another home.

On July 16, 1980, Mrs. Johnson, acting under pressure from her family, reported the child's disappearance to the Pottawattamie County Attorney. Defendant was arrested that afternoon on a charge of abandonment of a dependent person and for carrying a concealed weapon. Later that day Mrs. Johnson informed authorities that Kevin was in fact dead and was buried behind the duplex at 1526½ North Broadway. A search for the grave that evening proved unsuccessful. On July 17, 1980, however, searchers located the gravesite and recovered the body. An autopsy disclosed that Kevin died from a blunt trauma to the head, causing increased intracranial pressure and ultimate cessation of involuntary body functions.

On July 29, 1980, the county attorney charged defendant with first-degree murder. § 707.2, The Code 1979. After various pretrial motions, defendant waived jury trial and was tried before the court commencing November 4, 1980. The court found him guilty of first-degree murder and sentenced him to life imprisonment.

On appeal defendant asserts that the trial court erred in (1) denying his motions to change the venue and to limit expanded media coverage of his trial, resulting in denial of the constitutional right to a fair trial, (2) overruling his motion to suppress statements made in an interview, (3) denying his motion in limine to exclude prior acts of child abuse, (4) permitting Mrs. Johnson to testify against him in violation of privilege, and (5) denying the ground of his motion for a new trial based on insufficient corroboration of an accomplice.

I. *Fair trial.* Defendant first asserts that he did not receive a fair trial as guaranteed by the due process clause of the fourteenth amendment to the United States Constitution because of prejudicial pretrial publicity and expanded media coverage of the proceedings. He bases his contention on several claims.

A. Defendant filed a motion for a change of venue to a city similar in size to Council Bluffs, stating such prejudice had arisen in Pottawattamie County that a substantial likelihood existed a fair trial could not be obtained there. *See* Iowa R.Crim.P. 10(9)(*b*). In support of the motion defendant submitted affidavits of three criminal defense attorneys from the Council Bluffs area, the script of several television news reports broadcast from an Omaha television station, newspaper articles from both Omaha and Council Bluffs daily papers, and statistics on the telecast range of the television station and the circulation of the two papers. The trial court overruled the motion, stating that defendant was not a person of prominence or notoriety in the community and that selection of a jury would be difficult anywhere due to the nature of the charges. On appeal defendant contends that the district court abused its discretion in overruling the motion. Our task is complicated by defendant's subsequent waiver of jury trial; we have no voir dire record of the actual level of prejudice, if any, in the jury panel.

■ The State argues initially that since defendant waived jury trial, he gave up his right to challenge the trial court's denial of his motion to change the venue, citing *Butzman v. United States*, 205 F.2d 343 (6th Cir.), *cert. denied*, 346 U.S. 828, 74 S.Ct. 50, 98 L.Ed. 353 (1953). In that case a federal appeals court held that when the defendant elected to be tried by the district judge he waived his claim that the court abused its discretion in denying his motion for a change of venue. *Id.* at 349–50.

Our research indicates, however, that the *Butzman* holding has not been enthusiastically accepted everywhere and, in fact, has been criticized. The American Bar Association Standards state:

It shall not be a ground for denial of a change of venue that one such change has already been granted. *The claim that the venue should have been changed or a continuance granted shall not be considered to have been waived by the waiver of the right to trial by jury* or by the

failure to exercise all available peremptory challenges.

A.B.A. Standards Relating to Fair Trial and Free Press § 3.2(e), at 119–20 (App. Draft 1968) (emphasis added). The rationale supporting the standard is stated in the accompanying comment:

[T]he subsection provides that the right to a continuance or transfer shall not be deemed to have been waived by waiver of a jury or by failure to exhaust all peremptory challenges. The suggestion of some courts that such conduct amounts to a waiver seems to require the defendant to take unnecessary risks. If the defendant has satisfied the criterion for the granting of relief, it should not matter that he has subsequently waived a jury, perhaps out of fear that even a jury meeting accepted standards will not be truly free from bias, or has failed to use his peremptory challenges, perhaps because he prefers the ills he has to others he has not yet seen.

*Id.* at 128. *See State v. Williams*, 285 N.W.2d 248, 266 (Iowa 1979), *cert. denied*, 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980) (adopting first sentence of § 3.2(e)); *Commonwealth v. Dobrolenski*, 460 Pa. 630, 635–38, 334 A.2d 268, 270–72 (1975) (adopting second sentence).

■ We find the position of the standards to be persuasive and reject the State's claim of waiver. We thus review the record de novo to determine whether the district court abused its discretion in denying the motion. *State v. Love*, 302 N.W.2d 115, 122 (Iowa 1981); *State v. Cornelius*, 293 N.W.2d 267, 269 (Iowa 1980); *State v. Paulsen*, 265 N.W.2d 581, 588 (Iowa 1978).

Under rule 10(9)(*b*) of the Iowa Rules of Criminal Procedure, a change of venue must be granted when the court is "satisfied such prejudice exists in the county of a scheduled trial that there is a 'substantial likelihood a fair and impartial trial cannot be had there'." *Love*, 302 N.W.2d at 122. *See Cornelius*, 293 N.W.2d at 268–69. Defendant contends that he is entitled to a change of venue on the ground that newspaper articles made reference to past epi-

sodes of abuse against Kevin and to a prior conviction of defendant for assault with intent to inflict serious injury arising from the stabbing of his former wife. He also relies on the inherently inflammatory nature of the alleged crime.

The record concerning the motion included eleven newspaper stories from the Omaha World Herald and thirteen from the Council Bluffs Nonpareil. Stories from the Herald began on July 17, 1980, the date the child's body was recovered, and, with one exception, ended on August 23. That exception involved a story published on September 21 detailing the experience of Iowa's one-year "cameras in the courtroom" experiment and stating that defendant's arraignment had been televised and his trial was scheduled for expanded coverage. Of the ten stories concerning the incident itself, four made reference to the child abandonment charge on which defendant was originally arrested or to the prior assault conviction. Apart from those alleged prejudicial statements, the stories contained nonprejudicial narratives of the incident. These appeared between July 18 and July 22, immediately after discovery of the body. The remaining six stories were published intermittently between July 17 and August 23 and contained factual accounts of defendant's arraignment, pretrial motions, and attempt to obtain a new attorney. The trial began November 4, 1980.

Stories from the Nonpareil began on July 18, 1980, and ran until October 6. The July 18 story was accompanied by two pictures, one showing the gravesite and the other depicting an officer wearing a gas mask carrying a box apparently containing the child's body. Of the thirteen stories, three made reference to the child abuse charge or the prior conviction. As with the Herald, the Nonpareil stories containing those statements were in a four-day period immediately following the crime. The remaining ten stories were published between August 30 and October 6 and contained factual descriptions of defendant's arraignment and pretrial motions, and other related events.

The record on the motion also included the script from eight newscasts televised from station WOWT in Omaha. Three of those newscasts occurred on July 17, 1980, two on July 18, two August 5, and one on October 6. Five of the newscasts had accompanying videotape showing an officer wearing a gas mask and carrying a box containing the child's body. The stories of July 17 and 18 contained factual statements of the discovery of the body, the autopsy, and the charge against defendant. The August 5 stories detailed defendant's arraignment. The October 6 story concerned defendant's motion for a change of venue. All of these stories were presented in a nonprejudicial fashion and none made mention of the earlier child abuse charge or defendant's prior conviction.

■ Exposure to news accounts does not establish ipso facto a substantial likelihood of prejudice in the minds of prospective jurors. *Cornelius*, 293 N.W.2d at 269. *See Murphy v. Florida*, 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589, 593–94 (1975); *State v. Marr*, 316 N.W.2d 176 (Iowa 1982). An examination of the pretrial publicity discloses that it was, on the whole, objective, factual reporting. The media expressed no view on defendant's guilt or innocence. Nor was the pretrial coverage inaccurate, misleading, or unfair. Likewise, no editorial denunciations of defendant appeared and no emotional stories regarding defendant or Kevin were published. Each account constituted an objective description of the basic facts of the incident or of the preliminary proceedings in the case. No attempts were made to inflame the public mind or to sensationalize the event.

The newspaper stories referring to the child abuse charge and prior conviction were limited to a four-day period immediately following the discovery of the body and the arrest of defendant. Stories appearing after July 22 concerned the various pretrial motions and went no further than naming defendant and stating that he was charged with murder of his son.

Most of the pretrial publicity was confined to a relatively short period of time. That period was separated from the trial date by approximately three months. We have held in past cases that a similar period of time was sufficient to dissipate any prejudicial effect that might have been created by adverse publicity. *Cornelius,* 293 N.W.2d at 269 (two-month interval); *State v. Pelelo,* 247 N.W.2d 221, 223 (Iowa 1976) (three-month interval); *State v. Loney,* 163 N.W.2d 378, 382 (Iowa 1968) (eleven-week interval).

On two occasions we have held knowledge of a defendant's past criminal record to be insufficient to mandate a change of venue. *Paulsen,* 265 N.W.2d at 588; *State v. Elmore,* 201 N.W.2d 443, 445 (Iowa 1972). Courts in other jurisdictions have upheld denials of motions to change the venue based on publicity detailing a defendant's past criminal activity. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (no denial of constitutional right to fair trial where pretrial publicity detailed defendant's criminal record including convictions for murder and transportation of stolen securities in interstate commerce); *Mayola v. State of Alabama,* 623 F.2d 992, 996–99 (5th Cir. 1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981) (although dispute as to whether change of venue formally requested, court found no denial of constitutional right to fair trial where, in prosecution for murder of young child, · publicity detailed defendant's past convictions of sodomy with young children); *State v. Greenawalt,* 128 Ariz. 388, 391–93, 626 P.2d 118, 121–23 (1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 167, 70 L.Ed.2d 136 (1981) (no error denying motion for change of venue where publicity detailed defendant's prior murder conviction and prison escape); *People v. Harris,* 28 Cal.3d 935, 948–50, 623 P.2d 240, 246–47, 171 Cal. Rptr. 679, 685–86 (1981) (no error in denying motion where publicity detailed prior manslaughter conviction); *Anderson v. State,* 222 Ga. 561, 562, 150 S.E.2d 638, 639 (1966) (no error in denying motion where publicity included numerous articles on prior criminal record); *Williams v. State,* 222

Ga. 208, 210–11, 149 S.E.2d 449, 452 (1966), *cert. denied,* 385 U.S. 887, 87 S.Ct. 184, 17 L.Ed.2d 115 (1966) (no error in denying motion where publicity recited prior criminal record); *State v. Berry,* 329 So.2d 728, 730 (La.1976) (no error in denying motion where publicity detailed earlier convictions of murder and rape); *State v. Lee,* 556 S.W.2d 25, 29–31 (Mo.1977), *vacated on other grounds,* 439 U.S. 461, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979) (no error in denying motion where publicity .recited prior criminal record); *Kaplan v. State,* 96 Nev. 798, 800, 618 P.2d 354, 356 (1980) (no error in denying motion where publicity recited prior criminal record including murder conviction); *Commonwealth v. Krasner,* 285 Pa. Super. 389, 406, 427 A.2d 1169, 1177 (1981) (no error in denying motion where publicity detailed prior obscenity convictions); *State v. Cannon,* 248 S.C. 506, 516–18, 151 S.E.2d 752, 756–58 (1966) (no error in denying motion where publicity detailed prior larceny and assault convictions). *See also Dobbert v. Florida,* 432 U.S. 282, 302–03, 97 S.Ct. 2290, 2302–03, 53 L.Ed.2d 344, 362 (1977).

Other jurisdictions have also upheld denials of changes of venue in cases containing inherently inflammatory charges similar to the charge in the instant case. *Aycock v. State,* 50 Ala.App. 130, 277 So.2d 404, 406 (1973) (no abuse of discretion in denying motion in murder prosecution where defendant beat three-year-old stepdaughter to death); *People v. Jacobson,* 63 Cal.2d 319, 325–26, 405 P.2d 555, 559–60, 46 Cal.Rptr. 515, 516–20 (1965), *cert. denied,* 384 U.S. 1015, 86 S.Ct. 1954, 16 L.Ed.2d 1036 (1966) (no denial of right to fair trial in denying motion in murder prosecution where defendant drowned twenty-month-old daughter in bathtub); *Dobbert v. State,* 328 So.2d 433, 440 (Fla.1976), *aff'd,* 432 U.S. 282, 302–03, 97 S.Ct. 2290, 2302–03, 53 L.Ed.2d 344, 362 (1977) (no abuse of discretion in denying motion in murder and child abuse prosecution where defendant beat two infant daughters to death and inflicted serious bodily injuries to two sons); *Messer v. State,* 247 Ga. 316, 322, 276 S.E.2d 15, 21 (1981) (no abuse of discretion in denying

motion in murder and kidnapping prosecution where defendant abducted, sexually abused, and killed eight-year-old niece); *State v. Clark*, 386 A.2d 317, 319–21 (Me. 1978) (no error in denying motion in murder prosecution where defendant, live-in boyfriend of mother, beat twenty-three-month-old child to death); *Daumer v. State*, 381 So.2d 1014, 1015–16 (Miss.1980) (no error in denying second change of venue in murder prosecution where defendants beat young son to death); *State v. Austin*, 84 S.D. 405, 409–10, 172 N.W.2d 284, 286–87 (1969) (no abuse of discretion in denying motion in manslaughter prosecution where defendant beat to death two-year-old son); *Adams v. State*, 563 S.W.2d 804, 806–08 (Tenn.App. 1978) (no error in denying motion in murder prosecution where defendant beat four-year-old stepson to death—remarkably similar to present case).

Our independent evaluation of the record convinces us that the district court's ruling on the venue motion was within the permissible range of discretion. Defendant's contention is therefore without merit.

■ B. Without success, defendant twice sought to limit expanded media coverage of the prosecution proceedings. Initially he filed an objection to expanded coverage of the arraignment. Later he filed an objection directed toward limiting coverage of his trial. He alleges that the trial court erred in overruling his objections and he contends that expanded coverage violated his constitutional right to a fair trial under the fourteenth amendment to the United States Constitution.

As of January 1, 1980, this court suspended Canon 3 A(7) of the Iowa Code of Judicial Conduct and substituted Revised Canon 3 A(7) to permit expanded media coverage of judicial proceedings on an experimental basis. *State v. Gilroy*, 313 N.W.2d 513, 516 (Iowa 1981); *State v. Webb*, 309 N.W.2d 404, 408 (Iowa 1981). Revised Canon 3 A(7) states:

> Subject at all times to the authority of the presiding judge to control the conduct of proceedings before the court to ensure decorum and prevent distractions and to ensure the fair administration of justice in the pending cause, electronic media and still photography coverage of public judicial proceedings in the trial and appellate courts of this state shall be allowed in accordance with rules of procedure and technology promulgated by the Supreme Court of Iowa.

Rule 2(b) adopted by this court states:

> A judge shall permit expanded media coverage of a proceeding, unless he or she concludes, on objection and showing of good cause that, under the circumstances of the particular proceeding such coverage would materially interfere with the rights of the parties to a fair trial.

1. On August 1, 1980, defendant filed a written objection to the use of photographic equipment, television cameras, and electronic sound recording devices in the courtroom during his arraignment, on the ground that expanded coverage would materially interfere with his right to a fair trial. He alleged that a substantial amount of publicity had already occurred and that additional coverage would decrease the likelihood of an unbiased jury. He submitted two newspaper articles from the Council Bluffs Nonpareil and two from the Des Moines Register to demonstrate the extent of publicity surrounding the case. The trial court overruled the objection after a hearing, and defendant claims error.

The test for resolving constitutional challenges to expanded coverage was enunciated by the United States Supreme Court in *Chandler v. Florida*, 449 U.S. 560, 582–83, 101 S.Ct. 802, 813–14, 66 L.Ed.2d 740, 757 (1981). *See Webb*, 309 N.W.2d at 408. Under that test a defendant must show "prejudice of constitutional dimensions"; he must demonstrate that expanded coverage will compromise the ability of the fact finder to adjudicate fairly or that the coverage will have an adverse impact on the trial participants sufficient to constitute a denial of due process. To establish prejudice, he can request a post-trial evidentiary hearing to show adverse impact or injury. *Id.*

In the present case defendant has not established prejudice arising from expanded coverage of his arraignment, and our review of the record discloses none. The record does not show that defendant requested a subsequent evidentiary hearing to establish prejudice or that coverage of the arraignment affected his ability to receive a fair trial. The record is silent as to the type and extent of publicity that arose as a result of coverage of the arraignment. Without that information, we are unable to say that the coverage increased the level of prejudice in the community. The trial court did not err in overruling defendant's objection to expanded coverage of the arraignment.

2. On November 3, 1980, defendant filed an objection to expanded coverage of the trial. His objection was based on grounds that notice of expanded coverage was not given to his attorney within the time period prescribed by our rules and that coverage would materially interfere with his ability to obtain a fair trial. The trial court overruled the objection after a hearing.

Rule 3(b) of our rules on expanded coverage states:

> *Advance notice of coverage.* All requests by representatives of the news media to use photographic equipment, television cameras, or electronic sound recording equipment in the courtroom shall be made to the media coordinator. The media coordinator shall in turn inform counsel for all parties, and the judge who is designated to preside over the proceedings, of such requests *at least seven days in advance of the time the proceeding is scheduled to begin*, unless such time is reduced or extended by court order.

(Emphasis added.) Defendant alleges that his attorney received notice of the request for expanded coverage on October 30, 1980, that trial commenced on November 4, 1980, and that his attorney therefore did not receive seven days' notice. Defendant contends that he was prejudiced by the untimely notice, as he did not have adequate time to gather evidence and prepare argument showing why expanded coverage should not be permitted.

The notice did not conform to rule 3(b). Although we do not condone the trial court's action in permitting expanded coverage under those circumstances, we conclude that reversal is not in order on this account.

The objection filed on November 3 was couched in conclusory terms and gave no specific reasons for requesting denial of expanded coverage. The violation of rule 3(b) may excuse that deficiency, as defendant was not provided the prescribed time to meet his burden.

Following trial, however, defendant had opportunity to make a showing that expanded coverage prejudiced his right to a fair trial. *See Webb*, 309 N.W.2d at 408. On this appeal, moreover, defendant has also had adequate time to prepare argument on prejudice from expanded coverage. We therefore conclude that the failure to give the full seven days' notice falls within the "technical defect" rule enunciated in *State v. Smith*, 282 N.W.2d 138, 141 (Iowa 1979):

> This court has a long history of not reversing on the ground of technical defects in procedure unless it appears in some way they have prejudiced the complaining party or deprived him or her of full opportunity to make defense to the charge presented in the indictment or information.

*See also State v. Kile*, 313 N.W.2d 558, 560 (Iowa 1981); *State v. Rank*, 214 N.W.2d 136, 138 (Iowa 1974); *State v. Thompson*, 254 Iowa 331, 337, 117 N.W.2d 514, 517 (1962); *State v. Jensen*, 245 Iowa 1363, 1367, 66 N.W.2d 480, 483 (1954).

We thus turn to the question of whether defendant was deprived of his constitutional right to a fair trial by expanded coverage, under the *Chandler* test. Defendant contends that the coverage had an adverse impact on the trial participants sufficient to constitute a denial of due process. He relies on harassing telephone calls made to the defense attorneys, on the trial judge's exposure to a media display during the trial, and on defendant's own decision

not to testify because of expanded coverage.

Our review of the record discloses a limited reference by the trial court to several harassing telephone calls received by the defense attorneys. The trial court described those calls as "really not too threatening." More important, the attorneys who received the calls gave no indication that the calls in any manner impaired their performance or ability to provide an effective defense. Further, the record does not support defendant's assumption that the calls were prompted by the media coverage of the trial.

Likewise we do not find that expanded coverage had an adverse effect upon the trial judge, who in this trial acted as the fact finder. He described one instance in which he observed a media presentation, but he indicated that the particular news report was merely a recount of the day's events at the trial without editorial comment. He also stated that initially he experienced difficulty in preventing contact with persons outside the courtroom regarding the trial but that he took measures to prevent contact, the most notable being to stay at home while not presiding at trial. He denied that the media exposure or the personal contacts had any effect on his judgment, and our evaluation of the record supports his assessment.

Defendant further claims that expanded coverage of the trial adversely affected the trial judge by informing him of defendant's prior assault conviction. The trial judge did learn that defendant was involved in an assault, but the judge was unable to remember the source of the knowledge, the details surrounding the assault, or the disposition of the matter. More important, any knowledge of the assault cannot be attributed to the expanded coverage of the trial, as the judge indicated awareness of the incident before trial began.

Defendant also contends that expanded coverage of the trial had an adverse impact on him personally, sufficient to deprive him of his constitutional right to defend against the State's accusations. That contention is based on the following statement he made to the trial court at sentencing: "I'd like to note on the record, Your Honor, that for my own purposes in the future I didn't take the stand because of the media."

Assuming defendant would have testified in the absence of expanded coverage, the question is whether such testimony would have strengthened his defense. In his statement to the trial court defendant failed to indicate what his testimony would have been, how it might have affected the outcome of the trial, or the manner in which it would have benefited his defense. We are thus left to speculate as to the content and value of testimony that would have been given but for expanded coverage. Defendant's intimation that his testimony would have bolstered his defense, without more, is an insufficient basis on which to predicate reversible error. In any event, defendant did exercise his right to defend against the State's accusations by cross-examining the State's witnesses and offering testimony in his own behalf, and by vigorous representation by counsel. We conclude that the expanded coverage did not affect defendant's ability to conduct his defense.

The trial court did not commit error in overruling defendant's motion to limit media coverage of the trial.

C. Defendant argues that the district court's denial of his motion to change the venue coupled with its refusal to limit expanded coverage forced him to waive his right to jury trial in an effort by him to obtain a fair trial. He asserts that the waiver was involuntary and therefore constitutionally defective. He further contends that he was deprived of a fair trial when he was tried by the court.

■ The waiver of a constitutional right must be a voluntary, knowing, intelligent act, done with awareness of the relevant circumstances and likely consequences. *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747, 756 (1970); *State v. Boone*, 298 N.W.2d 335, 337 (Iowa 1981); *State v. Fisher*, 279 N.W.2d

265, 266 (Iowa 1979); *State v. Russell*, 261 N.W.2d 490, 492 (Iowa 1978).

■ Our review of the record convinces us that defendant's waiver of jury trial satisfied the constitutional requirements. The trial court informed defendant that he had a constitutional right to trial by jury which only he could waive. The trial court also explained to defendant that waiver would mean he would be tried solely by the trial judge and he would never have a right to a jury trial on the charge. It repeatedly inquired whether defendant understood his rights and was making a voluntary decision. Defendant informed the trial court that he had considered the matter for two to three weeks and had conferred with his attorneys on the decision and understood the advantages and disadvantages associated with each alternative. He further stated, "I had to weigh all the alternatives and took a great deal of time and thinking about the matter, but at this time I would like to waive the jury trial." In addition, the trial court inquired into defendant's educational background to ensure that he understood the gravity of the decision he had reached. Defendant waived his right to be tried by a jury in an in-chambers proceeding and again in open court. In none of those discussions did he ever indicate that he had been forced into waiver by the trial court's earlier rulings on the venue or media motion. We find that defendant's waiver was voluntarily made with full appreciation of the legal consequences.

■ We also conclude that defendant was not deprived of a fair trial before the trial judge. Although the judge was aware of the pretrial publicity, a defendant seeking to have his conviction reversed on the ground that he was deprived of a fair trial. due to adverse publicity must demonstrate an actual, identifiable prejudice attributable to the effect of that publicity on the fact finder. *Chandler v. Florida*, 449 U.S. 560, 581–82, 101 S.Ct. 802, 813, 66 L.Ed.2d 740, 755–56 (1981); *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975); *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d

751, 756 (1961); *United States v. Garza*, 664 F.2d 135, 138 (7th Cir. 1981); *United States v. Horton*, 646 F.2d 181, 188 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 516, 70 L.Ed.2d 388 (1981); *Mayola v. State of Alabama*, 623 F.2d 992, 996 (5th Cir. 1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981); *United States v. Johnson*, 584 F.2d 148, 154 (6th Cir. 1978), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979). Defendant does not specify any instance in which the trial court became prejudiced by the dissemination of adverse publicity, and our review of the record fails to disclose any. We will not presume prejudice from the publication or broadcast of news stories. *State v. Marr*, 316 N.W.2d 176, 181 (Iowa 1982); *State v. Frank*, 298 N.W.2d 324, 327 (Iowa 1980); *State v. Sallis*, 262 N.W.2d 240, 247 (Iowa 1978); *State v. Sefcheck*, 261 Iowa 1159, 1173, 157 N.W.2d 128, 136 (1968). In the absence of a showing of prejudice, we conclude that defendant was not deprived of a fair trial.

II. *Interrogation of defendant.* After conferring with Mrs. Johnson on the morning of July 16, Pottawattamie County Attorney David E. Richter filed a preliminary information (complaint) accusing defendant of abandonment of a dependent person. § 726.3, The Code 1979. An arrest warrant, signed by a district judge, issued on the basis of that complaint. § 804.1, The Code. Council Bluffs police executed the warrant at about 3:00 p. m. the same day by arresting defendant on the abandonment charge, and also for carrying a concealed weapon. § 724.4, The Code. A complaint for carrying a concealed weapon was not filed until the following day.

The police took defendant to Pottawattamie County jail, where Officers Brown and Kaftan questioned him at approximately 3:55 p. m. At that time the authorities did not know that Kevin was dead. After informing defendant of the officers' identities, Officer Kaftan read him the *Miranda* rights from a standard Council Bluffs Police Department form. Defendant himself then read the form and signed a waiver,

indicating that he understood his rights but was willing to waive them and make a statement. The officers then questioned him regarding the whereabouts of Kevin. Shortly after the questioning began, a deputy interrupted the interview and informed the officers that defendant's attorney, James A. Pugh, had telephoned to speak with him. The session then ended. As the officers were leaving the cell block at 4:00 p. m., defendant placed his hand over the telephone receiver and told Brown "to get back to him and let him know what he found out." Defendant made no incriminating statements during that brief interview.

At about 4:30 p. m. that afternoon, Pugh arrived at the county jail. Before meeting with defendant, however, he visited the county attorney's office where he spoke with Richter and other members of the staff regarding the charges against defendant. During their discussion Richter expressed concern about locating Kevin, and Pugh replied that after meeting with defendant he would return to the office and inform Richter of any information that might assist in finding the child. After conferring with defendant for an hour, Pugh returned to the office and told Richter that he was unable to obtain any information regarding Kevin's whereabouts.

In the next few hours the authorities learned from Mrs. Johnson that Kevin was dead and was buried in the wooded area behind the duplex. After an unsuccessful search for the grave, Officer Brown returned to the county attorney's office to consult with Richter. At approximately 9:45 p. m., Brown and Richter went to the county jail and took defendant to an interview room at the Council Bluffs Police Department.

Defendant subsequently filed a pretrial motion to suppress all statements obtained during this second interview on the grounds that they were obtained in violation of his fifth- and fourteenth-amendment right against self-incrimination and sixth- and fourteenth-amendment right to counsel. The evidence at the hearing on the motion showed that after entering the room,

Brown informed defendant that he and Richter had learned of the child's death and burial. Brown then advised defendant that he had the same rights as those earlier explained to him and that he could remain silent if he chose. Defendant inquired whether he should have his attorney present and both Brown and Richter told him that this was a decision he had to make for himself. No further discussion on the need for an attorney took place. Defendant then inquired what the authorities knew and the whereabouts of his wife. When asked if he was willing to discuss the baby's death, defendant said he would talk about the burial but not the death itself. The interview lasted for approximately one hour and during that period defendant made some inculpatory statements but did not discuss the death of the child.

After the hearing on the suppression motion, the district court found, as to defendant's right against self-incrimination, that defendant made a knowing and intelligent waiver of his *Miranda* rights and that his statements were voluntary. The court did not make findings on whether defendant waived his sixth- and fourteenth-amendment right to counsel, but did overrule the motion. On appeal, defendant contends the district court erred in refusing to suppress his statements in this interview.

A. Defendant first asserts that his statements were obtained in violation of his fifth- and fourteenth-amendment right against self-incrimination.

1. Defendant alleges that at the outset of the second interview, he stated to Brown and Richter that Pugh had advised him not to discuss the case with anyone and by that statement he invoked his right to remain silent. He contends that after he thus invoked his right to silence, Brown and Richter continued to interrogate him in violation of the principle expressed as follows by the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694, 723 (1966) (footnote omitted):

> If the individual indicates in any manner, at any time prior to or during question-

ing, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

▇ Whether defendant invoked his right to remain silent is a fact question. *State v. Fisher*, 279 N.W.2d 265, 267 (Iowa 1979); *State v. Millspaugh*, 257 N.W.2d 513, 515 (Iowa 1977). Since the issue involves a constitutional right, we review the record de novo. *State v. Adlape*, 307 N.W.2d 32, 36 (Iowa 1981); *State v. Hartman*, 281 N.W.2d 639, 643 (Iowa App.1979); *Fisher*, 279 N.W.2d at 266; *State v. Conner*, 241 N.W.2d 447, 453 (Iowa 1976).

The State denies defendant stated to Brown and Richter that his lawyer told him to remain silent. Defendant did not testify at the suppression hearing or at trial. Evidence lending credence to his allegation was, however, provided through his attorney, Pugh, who testified he met with defendant on the afternoon of July 16 and told him not to discuss the matter of Kevin with anybody. Pugh also testified that at a meeting with defendant on the morning of July 17, "the first thing I said was, 'Didn't I tell you not to talk to anybody,' and [defendant] said, 'Yeah, I told them that you told me not to talk to anybody.'" But Pugh did not attend the second interview itself and, of course, could not testify firsthand what defendant did say at that meeting. Pugh did testify regarding a discussion with Richter concerning defendant's alleged statement: "I think I asked Mr. Richter 'Did [defendant] tell you [about my advice to remain silent]?' and Mr. Richter said, 'Yeah, but then we just kept talking and he decided to talk to us.'"

On the other hand, Brown, who was present at the second interview, testified

that defendant never referred to any advice from his attorney and did not make the alleged statement. Richter, who likewise testified from firsthand knowledge, also denied that defendant had made the statement. Our independent evaluation of the record leads us to the finding that defendant did not make the alleged statement or invoke his right to remain silent in any other manner at the second interview.

▇ 2. Defendant alleges also that at the outset of the second interview he invoked his right to have his attorney present during the questioning, that this should have terminated the interview, and that any statements made after the invocation violated his rights under *Miranda*. *See* 384 U.S. at 444–45, 86 S.Ct. at 1612, 16 L.Ed.2d at 707 ("If, however, [defendant] indicates in any manner and at any stage of the [interrogation] that he wishes to consult with an attorney before speaking there can be no questioning."). *See also Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 387 (1981); *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197, 209 (1979).

At the suppression hearing Brown testified:

Q. What was said at that time? A. We brought him into the room and sat him down. I advised him that—as per his request that I return and tell him what we found out.

Q. Did he make any statement at that time? A. He asked me if he should have an attorney. I advised him that was up to him, that had to be his decision to make.

Q. Then what happened? A. He turned to Dave Richter and asked him what he thought. Dave Richter advised him that if he was in Mr. Johnson's shoes, he would have an attorney.

Q. What happened then? A. He wanted to know where his wife was at. We told him that she was in the building giving a statement.

Q. Now, Officer Brown, was there any mention made to him before this conversation between you and him about

his right to remain silent? A. I informed him that he still had the rights that we advised him earlier in the evening.

Q. And is that when he asked the questions of you and Mr. Richter? A. Yes.

County Attorney Richter testified concerning the same events:

Q. What happened next? A. Brown told him he'd found some things out and said he'd like to talk to him about them. Kevin said, "Okay. Should I have my lawyer here?" Lyle Brown said, "Kevin, that's the choice you're going to have to make if you want your lawyer or not." Kevin, I assume, knew I was a lawyer because I think I told him that earlier in the day who I was. He asked me. Knowing what I knew at that time, I told Kevin it would be in his best interest to have a lawyer there and if it were me, I'd have one there.

Q. Then what was said? A. Well, he wanted to know what me and Brown knew so I think the only thing with regard at that time to his rights that I recall being said, "You understand, Kevin, you don't have to talk to us at all. You've been advised of your rights," and he said, "Yeah." And he wanted to know what Brown had found out so Brown started telling him various things.

The question thus becomes whether defendant's inquiry as to the advisability of his attorney's presence was sufficient to request counsel and to require that the discussion end. The district court concluded that defendant's inquiry did not meet with deception and defendant continued the discussion as a matter of choice, and that defendant therefore did not request counsel necessitating cessation of the conversation.

We find that defendant manifested indecision as to whether he desired counsel. We also find, however, that defendant fully understood he had the right to counsel and to remain silent, if he so desired. His inquiries to Brown and Richter met with information of his right to counsel. The responses were not designed to discourage defendant

from obtaining counsel, nor did the responses constitute trickery. Following the information, defendant did not request to have his attorney. See Miranda, 384 U.S. at 484–85, 86 S.Ct. at 1633, 16 L.Ed.2d at 729–30 (quoting from letter received from Solicitor General detailing FBI interrogative procedure, the Court stated, "If [defendant] is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel. Situations of this kind must necessarily be left to the judgment of the interviewing [officers]."). The record discloses that rather than pursuing the matter of counsel, defendant desired to learn what the authorities had found out since the initial interview. The officers did not initiate interrogation; rather, defendant questioned them. He commenced the discussion concerning their additional information and was not merely "respond[ing] to further police-initiated custodial interrogation." Edwards, 451 U.S. at 484, 101 S.Ct. at 1884, 68 L.Ed.2d at 386. Our evaluation of the record persuades us that defendant decided the presence of his attorney was unnecessary. We therefore hold, as the district court did, that defendant understood his right to counsel and did not make a statement sufficient to request counsel. The following decisions lend support to our conclusion. United States v. Bettenhausen, 499 F.2d 1223, 1231 (10th Cir. 1974) (no invocation of right to counsel where defendant asked interviewing officer if he needed counsel and officer responded that decision was for defendant to make); Collins v. Fogg, 425 F.Supp. 1339, 1341 (E.D.N.Y.), aff'd, 559 F.2d 1202 (2nd Cir.), cert. denied, 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977) (request to police officer for recommendation of attorney insufficient to invoke right to counsel and require cessation of questioning); People v. Whitman, 182 Colo. 6, 10, 510 P.2d 432, 434 (1973) (no invocation of right to counsel when defendant asked how to contact attorney but made no attempt to do so); Donovan v. State, 400 So.2d 1306, 1310 (Fla.App.1981) (no invocation of right to counsel when juvenile defendant inquired of officer whether he could obtain an

attorney without cost to him); *Grimsley v. State*, 251 So.2d 671, 672 (Fla.App.1971) (no invocation of right to counsel where, after being informed of such right, defendant asked officer whether he thought counsel was necessary); *People v. Krueger*, 82 Ill.2d 305, 311, 45 Ill.Dec. 186, 189, 412 N.E.2d 537, 540 (1980), *cert. denied*, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 390 (1981) (statement of defendant that "maybe I ought to have an attorney" insufficient to invoke right to counsel and require cessation of interview); *State v. Phillips*, 563 S.W.2d 47, 50–54 (Mo. 1978), *cert. denied*, 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979) (no invocation of right to counsel where defendant stated that he did not know whether he should speak to an attorney); *Lee v. State*, 560 P.2d 226, 233 (Okl.Cr.App.1977) (no invocation of right to counsel where defendant inquired what would be best way to get an attorney); *Reid v. State*, 478 P.2d 988, 999 (Okl. Cr.App.1970) (no invocation of right to counsel where defendant told whether to invoke such right was his decision and he thereafter made no effort to do so); *Commonwealth v. Weaver*, 274 Pa.Super. 593, 599, 418 A.2d 565, 568 (1980) (defendant did not invoke right to counsel by asking officer whether he thought she needed an attorney and officer told her that decision was hers to make). *See also* 2 Ringel, *Searches & Seizures, Arrests, and Confessions* § 28.3(e), at 28–11 (2d ed. 1981).

■ 3. Having concluded that defendant did not invoke his right to remain silent or request counsel, and that no necessity existed to terminate the second interview on those bases, we must determine whether defendant's inculpatory statements were made after an effective waiver of his *Miranda* rights and were made voluntarily. *State v. Aldape*, 307 N.W.2d 32, 37 (Iowa 1981); *State v. Hartman*, 281 N.W.2d 639, 643 (Iowa App.1979); *State v. Washington*, 257 N.W.2d 890, 895 (Iowa 1977), *cert. denied*, 435 U.S. 1008, 98 S.Ct. 1881, 56 L.Ed.2d 390 (1978). These are separate issues. *Aldape*, 307 N.W.2d at 37; *Hartman*, 281 N.W.2d at 643.

Defendant was first informed of his *Miranda* rights at approximately 4:00 p. m. on the day in question. He acknowledged an understanding of each right as it was read to him and, after reading the standard form himself, he signed a waiver form. At the beginning of the second interview he was informed that he still had the rights earlier explained to him and that he could refuse to speak with Brown and Richter. These events alone, of course, do not establish that the waiver was effective or that the subsequent statements were voluntary. *State v. Munro*, 295 N.W.2d 437, at 443; *State v. Jump*, 269 N.W.2d 417, 424 (Iowa 1978).

The record also indicates, however, that defendant is of above average intelligence and has had prior experience with the criminal law. *Aldape*, 307 N.W.2d at 37; *Munro*, 295 N.W.2d at 443; *Hartman*, 281 N.W.2d at 655; *Jump*, 269 N.W.2d at 424; *State v. Hansen*, 225 N.W.2d 343, 350 (Iowa 1975). No suggestion of physical mistreatment or prolonged interrogation appears. *Aldape*, 307 N.W.2d at 37; *Munro*, 295 N.W.2d at 443; *State v. Clough*, 259 Iowa 1351, 1358, 147 N.W.2d 847, 852 (1967). Nor was defendant coerced or deceived by Brown or Richter. *State v. Jacoby*, 260 N.W.2d 828, 833 (Iowa 1977).

After reviewing the circumstances surrounding the second interview, we agree with the trial court that defendant was adequately informed of his *Miranda* rights and that he voluntarily, knowingly, and intelligently waived them. The evidence also establishes that defendant's statements were voluntary in fact. In addition to the facts we have enumerated, the evidence discloses that defendant volunteered to discuss the burial of the baby and the location of the grave, but not the death itself. The statements he made were confined to his permissible subjects of discussion.

B. Defendant also contends that the statements were obtained in violation of his sixth- and fourteenth-amendment right to counsel. The sixth amendment states in part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

If an interrogation is conducted after the attachment of the sixth amendment, that amendment affords a right to counsel independent of the fifth amendment as interpreted in *Miranda. See Edwards v. Arizona*, 451 U.S. 477, 480 n.7, 101 S.Ct. 1880, 1882 n.7, 68 L.Ed.2d 378, 383 n.7 (1981); *United States v. Brown*, 569 F.2d 236, 240 (5th Cir. 1978) (Simpson, J., dissenting); *United States v. Miller*, 432 F.Supp. 382, 388 (E.D.N.Y.1977), *aff'd*, 573 F.2d 1297 (2nd Cir. 1978); Ringel, *supra*, § 29.1, at 29–1 ("[The sixth-amendment] standard for the admissibility of confessions and admissions exists independently of the voluntariness and *Miranda* standards, and serves a completely different purpose."). *See generally* Note, *Sixth Amendment Right to Counsel: Standards for Knowing and Intelligent Pretrial Waivers*, 60 B.U.L.Rev. 738, 739–47 (1980). To determine whether a statement has been obtained in violation of the sixth-amendment right to counsel, two questions must be answered: (1) had the right to counsel attached at the time of the statement? and if so, (2) did the suspect effectively waive that right?

1. The United States Supreme Court has held that the sixth-amendment right to counsel attaches at the time that adversary judicial criminal proceedings are initiated against a person, whether by way of formal charge, arraignment, preliminary hearing, information, or indictment. *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1892, 32 L.Ed.2d 411, 417 (1972). *See Moore v. Illinois*, 434 U.S. 220, 226, 98 S.Ct. 458, 464, 54 L.Ed.2d 424, 432 (1977); *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424, 436 (1977). The point at which adversary judicial criminal proceedings commence is a question of federal constitutional law. *United States ex rel. Sanders v. Rowe*, 460 F.Supp. 1128, 1139 (N.D.Ill.1978); *United States ex rel. Burton v. Cuyler*, 439 F.Supp. 1173, 1180 (E.D.Pa. 1977), *aff'd*, 582 F.2d 1278 (3rd Cir. 1978). In making that determination as to state prosecutions, however, state law prescribes the manner of commencing criminal proceedings. *Sanders*, 460 F.Supp. at 1139; *Burton*, 439 F.Supp. at 1180.

Section 804.1 of the Iowa Code provides, "A criminal proceeding may be commenced by the filing of a complaint before a magistrate." In the case of a simple misdemeanor, the prosecution proceeds on the basis of the filed complaint. Iowa R.Crim.P. 35. With an indictable offense, however, an information or indictment must be filed in order to prosecute the case to judgment. Iowa R.Crim.P. 4(2). Abandonment of a dependent person is a class C felony and as such is an indictable offense. § 726.3, 801.-4(13), The Code.

No information or indictment was filed on the abandonment or concealed weapon charge. An information charging murder was filed but not until July 29. The second interview was therefore conducted after defendant was arrested pursuant to a warrant issued on a filed complaint of abandonment growing out of the incident, but before a murder information had been filed and before defendant had made any formal appearance in court. The question is thus whether the filing of the complaint by the county attorney followed by the issuance of a warrant and the arrest of defendant constituted a "formal charge" within the Supreme Court's description of "adversary judicial criminal proceedings" which trigger the sixth- and fourteenth-amendment right to counsel.

A federal appellate court has held that the filing of a federal criminal complaint does not give rise to a right to counsel immediately upon arrest pursuant to a warrant. *United States v. Duvall*, 537 F.2d 15, 22 (2nd Cir.), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). In that case federal agents filed a complaint, obtained an arrest warrant, and, after arresting Duvall interrogated him in the absence of counsel. Duvall challenged his subsequent conviction on the ground that the filing of the complaint initiated a criminal prosecution and any interrogation of him without his counsel violated his sixth-amendment right. Rejecting his claim, the court stated at page 22:

We see no reason in principle why the filing of a complaint should be deemed to give rise to a right to counsel immediately upon arrest pursuant to a warrant. . . . Furthermore to hold that the accrual of the right to counsel is accelerated by use of the warrant procedure would tend to discourage this whereas the policy should be to encourage it.

*Duvall*, however, is distinguishable from the present case in several respects. Initially, the language of the federal rule of criminal procedure governing the filing and effect of complaints differs significantly from that of the Iowa statute. While section 804.1 of the Iowa Code provides that a criminal proceeding may be commenced by the filing of a complaint, rule 3 of the federal rules of criminal procedure simply states that "The complaint is a written statement of essential facts constituting the offense charged. It shall be made upon oath before a magistrate." The filing of a complaint in *Duvall* was therefore not given the same significance with respect to the commencement of a criminal proceeding as our section 804.1 denotes. The involvement of prosecutorial personnel in the filing of the complaints also differs in the two cases. In *Duvall* the complaint was sworn to and filed by a federal investigative agent; a federal prosecutor was involved only in assisting in the preparation of the complaint. On the other hand, County Attorney Richter prepared the complaint, swore to it, filed it, and obtained the arrest warrant. Finally, in *Duvall* the suspect had not retained counsel at the time of his interrogation, but here defendant had retained an attorney and had met with him as both Richter and Brown knew when they conducted the second interview. *See United States v. Miller*, 432 F.Supp. 382 (E.D.N.Y.1977), *aff'd*, 573 F.2d 1297 (2nd Cir. 1978) (distinguishing *Duvall* on ground that defendant had retained counsel prior to interrogation and concluding that right to counsel had attached).

Another federal case involved an Illinois habeas corpus petitioner who was arrested and charged by complaint by state authorities with the armed robbery of one Barbero.

*United States ex rel. Sanders v. Rowe*, 460 F.Supp. 1128 (N.D.Ill.1978). Later the same day the petitioner was interrogated in the absence of counsel and confessed to two other armed robberies. He pleaded guilty in state court to charges of the latter robberies, and in federal court he subsequently challenged those convictions on the ground that his sixth- and fourteenth-amendment right to counsel attached when the complaint was filed and that the confessions were therefore obtained in violation of that right. In determining whether petitioner's right to counsel had attached before the confessions were made, the court looked to Illinois law on the commencement of criminal actions:

Under Illinois law, prosecutions are commenced upon the issuance and filing of a complaint, information, or indictment. *See* Ill.Rev.Stat., ch. 38, §§ 111–1 – 111–2. . . . Thus, "[t]here is no question but that after the defendant is charged either by information, complaint, or indictment, it is an adversary proceeding and he is so entitled to counsel."

It is therefore irrelevant for sixth amendment purposes that no indictment or information was filed against petitioner on [the day of the confessions]. Since a complaint had been issued and filed, adversary judicial proceedings had begun against petitioner [on that day]. His sixth amendment rights had therefore attached.

*Id.* at 1139 (citations omitted). *Sanders* is particularly instructive given the similarity between Illinois and Iowa law on the commencement of criminal actions; the filing of a complaint in each state initiates a criminal proceeding. *See* Ill.Rev.Stat. ch. 38, § 111–1 (1980), and § 804.1, Iowa Code. In addition, each state requires an information or indictment in order to prosecute a felony to judgment. *See* Ill.Rev.Stat. ch. 38, § 111–2 (1980), and Iowa R.Crim.P. 4(2).

Another habeas corpus decision from a federal court deals with the extent of prosecutorial involvement in the procuring of an arrest warrant. *Lomax v. State of Alabama*, 629 F.2d 413 (5th Cir. 1980), *cert.*

*denied,* 450 U.S. 1002, 101 S.Ct. 1712, 68 L.Ed.2d 205 (1981). The petitioner was arrested by state authorities pursuant to warrant and was later required to participate in a lineup without assistance of counsel. At trial a witness identified petitioner as the person she had selected at the lineup. On appeal from the denial of the writ by a federal district court, the petitioner argued that the issuance of an arrest warrant triggered his sixth amendment right to counsel. The Court of Appeals for the Fifth Circuit focused on the level of prosecutorial involvement in obtaining the warrant:

> Thus, the point at which adversary proceedings commence is determinative of the presence of the right to counsel. Ascertaining when adversary proceedings have commenced is not to be accomplished through a purely formal application of quantitative criteria. *Rather, reliance should be placed on the sometimes elusive degree to which the prosecutorial forces of the state have focused on an individual. Once the state has committed itself to prosecute, it is then and "only then that the adverse positions of government and defendant have solidified....* It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable."

*Id.* at 415 (emphasis added). The court rejected petitioner's argument that the right to counsel attached upon the issuance of an arrest warrant. The court's rationale in reaching that conclusion, however, is instructive for the present case:

> An arrest by itself, with or without a warrant, falls far short of an official accusation by the state against the arrested individual. Furthermore, there is nothing in the records of the state court proceedings or the proceedings below that indicates any involvement of the state's prosecutorial forces at the time the warrant was issued: there is no evidence of a commitment to pursue prosecution or of an awareness of petitioner's impending arrest. Similarly, the record is devoid of indications that the Alabama prosecutor

customarily participates in preparing complaint affidavits used to secure warrants or in any other aspect of the warrant procedure. *Absent proof of significant prosecutorial involvement in procuring an arrest warrant, the arrest must be characterized as purely investigatory— the forces of the state have not yet solidified in a position adverse to that of the accused. Thus, petitioner's formalistic proposition must be rejected, although we do not intimate whether the same result would follow in a case in which the prosecution was involved in the warrant procedure.*

*Id.* at 416 (emphasis added). *See State v. Masaniai,* 628 P.2d 1018, 1023 (Haw.1981) (also finding no attachment of right to counsel after arrest pursuant to warrant on ground of no prosecutorial involvement in procuring warrant).

Other federal and state courts have dealt with the attachment of the right to counsel at the complaint or warrant stage. *United States ex rel. Robinson v. Zelker,* 468 F.2d 159, 163 (2nd Cir. 1972), *cert. denied,* 411 U.S. 939, 93 S.Ct. 1892, 36 L.Ed.2d 401 (1973) (right attached upon issuance of arrest warrant under New York penal law); *Cannistraci v. Smith,* 470 F.Supp. 586, 592 n.16 (S.D.N.Y.1979) (right attached after arrest and booking); *United States ex rel. Burton v. Cuyler,* 439 F.Supp. 1173, 1180–81 (E.D.Pa.1977), *aff'd,* 582 F.2d 1278 (3rd Cir. 1978) (right attached upon issuance of arrest warrant under Pennsylvania law); *People v. Hinton,* 23 Ill.App.3d 369, 372, 319 N.E.2d 313, 316 (1974) (right attached upon filing of complaint and issuance of arrest warrant); *Commonwealth v. Richman,* 458 Pa. 167, 170, 320 A.2d 351, 353 (1974) (right attached upon filing of complaint and issuance of arrest warrant).

On the basis of these authorities and the Iowa law on the commencement of criminal proceedings, we conclude that defendant's sixth- and fourteenth-amendment right to counsel attached prior to the second interview. An accusatory instrument in the form of a complaint had been filed requesting that a warrant issue for defendant's

arrest and that defendant be dealt with according to law. The county attorney's involvement in filing the complaint and procuring the warrant focused the prosecutorial forces on defendant. *Lomax*, 629 F.2d at 415. *See Escobedo v. Illinois*, 378 U.S. 478, 490–91, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977, 986 (1964). Given the significant level of prosecutorial involvement at this stage of the case, defendant's arrest can hardly be characterized as purely investigatory in nature. *Lomax*, 629 F.2d at 416; *Cuyler*, 439 F.Supp. at 1181. The forces of the State had solidified in a position adverse to defendant, at least with respect to the abandonment charge growing out of the incident. *Kirby*, 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 418. Defendant therefore had a right to counsel under the sixth- and fourteenth-amendments during the second interview. We do not, however, intimate whether the same result would follow in the absence of the prosecutorial involvement we have here.

■ 2. The next step is to determine whether defendant effectively waived his right to counsel before making the incriminatory statements. The State has a heavy burden to prove " 'an intentional relinquishment or abandonment of a known right or privilege.' " *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424, 439 (1977) (quoting from *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938)). *Brewer* divided the government's burden on the waiver issue into two parts: proof that the suspect (1) *understood* his right to counsel and (2) affirmatively *relinquished* that right.

Some jurisdictions hold that the threshold for finding a waiver of a suspect's sixth-amendment right to counsel in a pretrial interrogation is substantially higher than for waiver of the corresponding right under the fifth amendment. *United States v. Mohabir*, 624 F.2d 1140, 1147 (2nd Cir. 1980); *United States v. Satterfield*, 558 F.2d 655, 657 (2nd Cir. 1976); *Cannistraci v. Smith*, 470 F.Supp. 586, 593 n.17 (S.D.N.Y.1979); *United States ex rel. Sanders v. Rowe*, 460 F.Supp. 1128, 1140 (N.D.Ill.1978). *But see*

*State v. Carter*, 412 A.2d 56, 61 (Me.1980) (rejecting distinction). In jurisdictions where that rule is applied, a showing that an incriminating statement was made after an effective waiver of a suspect's *Miranda* rights is insufficient by itself to demonstrate waiver under the sixth-amendment. *Satterfield*, 558 F.2d at 657; *Rowe*, 460 F.Supp. at 1140. Several jurisdictions have also adopted rules which give greater protection for the sixth-amendment right to counsel than the United States Supreme Court has yet required. The Court of Appeals for the Second Circuit has adopted a rule that once the sixth amendment right to counsel attaches, a suspect may effectively waive it only after being advised of his constitutional rights by a judicial officer, whose duty it is to explain to the suspect the content and significance of those rights. *Mohabir*, 624 F.2d at 1151–53. *See United States v. Giacalone*, 508 F.Supp. 39, 43 (S.D. N.Y.1980), *aff'd*, 659 F.2d 1063 (2nd Cir. 1981). The Tenth Circuit Court of Appeals applies a rule that once a suspect has retained an attorney any statement obtained by interview may not be received in evidence for any purpose unless the suspect's attorney was notified of the interview and given a reasonable opportunity to be present. *United States v. Thomas*, 474 F.2d 110, 112 (10th Cir.), cert. denied, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973). New York courts hold, based on their state constitution, that a suspect may not waive the assistance of counsel in the absence of an attorney, once that right has attached. *People v. Hobson*, 39 N.Y.2d 479, 384 N.Y. S.2d 419, 348 N.E.2d 894 (1976). Although we decline to adopt the approaches taken in *Mohabir*, *Thomas*, or *Hobson*, we believe those cases demonstrate the care courts must exercise in analyzing a claim of waiver of the sixth-amendment right to counsel. We thus review the record again concerning the second interview to determine whether the State has sustained its heavy burden of showing a waiver under the standards applicable to the sixth amendment.

Defendant was first informed of his right to counsel when his *Miranda* rights were read to him at 4:00 p. m. on the afternoon

in question. He read the advice-of-rights form himself and then signed a waiver indicating he understood those rights but was willing to make a statement in the absence of an attorney. During the first interview he told Officers Brown and Kaftan that when he left his home that morning Kevin was there with Mrs. Johnson and as far as he knew the child was fine. That interview terminated when Pugh called to speak with defendant. As the officers were leaving the jail defendant interrupted his telephone conversation with Pugh to ask Brown "to get back to him and let him know what he found out." At that stage of the case the officers did not know that Kevin was dead, and they did not mention that possibility during the initial interview. Defendant's comment to Brown suggests he thought the officers were not satisfied with his story and they would be investigating further to determine Kevin's whereabouts. He wanted to be kept informed of their progress and requested Brown to return later. Defendant himself thus initiated the second interview. *See State v. Carter*, 412 A.2d 56, 59 (Me.1980) (finding waiver of sixth-amendment right to counsel where interview initiated by suspect).

After the first interview ended, defendant exercised his right to counsel by conferring with Pugh both by telephone and in person at the jail. Before leaving the jail, Pugh advised defendant not to discuss the case with anybody. Unlike *Brewer*, the police did not agree with Pugh not to interview defendant in counsel's absence. Although the absence of an agreement is not controlling on the waiver issue, it is a factor which has been deemed important. *See Brewer*, 430 U.S. at 415, 97 S.Ct. at 1248, 51 L.Ed.2d at 447 (Stevens, J., concurring).

Between the two interviews, the authorities learned that Kevin was dead. After an unsuccessful search for the grave, Brown, accompanied by Richter, returned to the jail to inform defendant of what he had discovered since their last discussion. Defendant wanted to learn any new information the authorities had obtained, the source of that information, and the whereabouts of his wife. After entering the interrogation room Brown told defendant that Mrs. Johnson had informed authorities Kevin was dead and buried. Brown then told defendant that he had the same rights as previously explained and that he was under no compulsion to talk. At that point defendant manifested indecision as to the necessity of counsel; his inquiry about the subject met with answers from both officers that he had a right to counsel. Richter went further and told defendant "it would be in his best interest to have a lawyer there, and if it were me I'd have one there." At that point neither Brown nor Richter said more. They gave accurate advice on the right to counsel, and defendant had a choice. Instead of asking for his attorney or refusing to talk, he initiated conversation to ascertain what the officers knew. Brown and Richter employed no deception or trickery to divert defendant from the question of counsel. Unlike the situation in *Brewer*, defendant at no time indicated that he was relying on the advice of counsel not to talk. Although Pugh had advised defendant not to discuss the case, defendant voluntarily chose to ignore this advice in his desire to ascertain what the authorities had learned.

The meeting then took the form of a free-flow conversation as opposed to an interrogation format. *See United States v. Gordon*, 493 F.Supp. 808, 812 (N.D.N.Y. 1980), *aff'd*, 655 F.2d 478 (2nd Cir. 1981) (free-flow conversation one factor in finding waiver of sixth-amendment right to counsel). At some point in the discussion defendant indicated that he would discuss the burial of Kevin, but not the death itself. The conversation thereafter proceeded on those subjects with defendant volunteering information and drawing a map to show the location of the grave. Defendant also stated that he would take Brown and Richter to the grave, an offer that was rejected because of the late hour. The conversation touched on other subjects, including the source of a large amount of money defendant was carrying when arrested, fraudulent use of checks by Mrs. Johnson, and defendant's wish to see his wife. At no time did defendant express a desire to cease discussion until his attorney was present.

Our independent evaluation of the record convinces us that the State sustained its burden of proving both that defendant understood his right to counsel and that he made an intentional relinquishment of that right.

■ C. As a final ground for exclusion of the incriminating statements, defendant urges that in the course of the second interview County Attorney Richter violated DR7–104(A)(1) of the Code of Professional Responsibility, which states:

> During the course of his representation of a client a lawyer shall not:
>
> (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

Richter knew at the time of the second interview that defendant was represented by counsel, and defendant contends that Richter violated DR7–104(A)(1) by failing to contact defendant's attorney. *See United States v. Thomas,* 474 F.2d 110, 111–12 (10th Cir.); *cert. denied,* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *United States v. Four Star,* 428 F.2d 1406, 1407 (9th Cir.), *cert. denied,* 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253 (1970); *Wilson v. United States,* 398 F.2d 331, 333 (5th Cir. 1968), *cert. denied,* 393 U.S. 1069, 89 S.Ct. 727, 21 L.Ed.2d 712 (1969); *United States v. Batchelor,* 484 F.Supp. 812, 813 (E.D.Pa. 1980); *People v. Green,* 405 Mich. 273, 292, 274 N.W.2d 448, 452–55 (1979).

Defendant argues that Richter's conduct required the court to suppress defendant's statements. We have held in the context of a search and seizure that a violation of DR7–104(A)(1) "would not require exclusion of the evidence unless it amounted to a deprivation of constitutional rights in itself or, as a part of the totality of the circumstances, rendered the consent involuntary." *State v. Hall,* 297 N.W.2d 80, 90 (Iowa 1980), *cert. denied,* 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981). When confronted with the identical issue the Michigan Supreme Court stated:

> This argument rests upon a basic misconception of the Code of Professional Responsibility. The provisions of the code are not constitutional or statutory rights guaranteed to individual persons. They are instead self-imposed internal regulations prescribing the standards of conduct for members of the bar. . . .
>
> The admissibility of evidence in a court of law, on the other hand, is normally determined by reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doctrines. Codes of professional conduct play no part in such decisions.

*Green,* 405 Mich. at 293–94, 274 N.W.2d at 454 (footnote omitted). *See Moore v. Wolff,* 495 F.2d 35, 37 (8th Cir. 1974); *Stringer v. State,* 372 So.2d 378, 382 (Ala. Cr.App.1979); *State v. McConnell,* 529 S.W.2d 185, 189 (Mo.App.1975).

We have already determined that defendant waived his fifth- and sixth-amendment rights. We have no occasion to comment on the ethical question defendant raises. The alleged ethical violation should be considered by the Committee on Ethics and Conduct of The Iowa State Bar Association in accordance with Court Rule 118. It does not in any event require exclusion of the evidence in question in this case. As in *Hall,* we refuse to exclude relevant evidence by applying the exclusionary concept to conduct which is not of constitutional magnitude.

■ III. *Evidence of prior injuries.* Defendant filed a motion in limine seeking, *inter alia,* to bar the introduction of evidence of Kevin's prior injuries which were unrelated to the cause of death. After hearing, the district court overruled that portion of the motion, finding the evidence of prior injuries relevant on the element of intent. Testimony at trial disclosed that during his lifetime, Kevin suffered fractures of several bones, injuries to the facial area, and a burn on the toe. Defendant objected at trial also to the admission of the evidence of prior injuries.

On appeal defendant asserts that the introduction of testimony of prior injuries was an improper attempt to adduce evidence of other crimes. We do not agree. We have several exceptions to the rule that evidence of other criminal acts is inadmissible—where such evidence tends to prove (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme of criminal activity, or (5) identity of the perpetrator. *State v. McConnell*, 275 N.W.2d 197, 202 (Iowa 1979). When a case falls within one of these exceptions, the State must also present clear proof that the accused was culpable in the other acts sought to be admitted; crimes of third persons are not relevant. *State v. Johnson*, 224 N.W.2d 617, 620 (Iowa 1974).

A crucial factual issue in this case was whether premeditation on the part of defendant existed, an intent question. If defendant inflicted the prior injuries, we agree with the district court that the evidence of them was probative of defendant's intent. Defendant argues, however, that the evidence was insufficient to link him to the prior injuries. He also directs our attention to three situations in which evidence of prior injuries was allegedly admitted without proper foundation. We have reviewed the testimony on this issue and find substantial proof in each instance from which the factfinder could find that defendant was responsible for the particular injury or act.

Defendant also challenges the testimony of an expert medical witness on the same grounds. A radiologist testified that before his fatal injuries Kevin had suffered fractures of the left humerus, left tibia, right femur, left clavicle, and several ribs. At the time of death these particular bones were in various stages of healing, indicating that the injuries were sustained at different times during Kevin's lifetime. When asked about the cause of these fractures, the witness testified that some were caused by a shaking or twisting of the bone, some by an over-firm grasping of the bone, and some by a direct blow to the bone. Defendant argues that the evidence was insufficient to attribute those injuries to him and that

their admission into evidence caused him prejudice.

The record discloses substantial evidence to support the inference that defendant was responsible for the injuries in question. Candice Brown, the younger sister of Mrs. Johnson, testified that on several occasions she saw defendant carry Kevin by his waist, throw the child into his crib, and place cotton in his mouth. Mrs. Johnson testified that on several occasions she saw defendant carry Kevin under one arm, drop him into the crib, play with him in an exceedingly rough manner, kick him, and drop him to a mattress on the floor when defendant was in a standing position. She also testified that on several instances she observed defendant twist Kevin's toes until he cried and strike the child in the face with his fist. The testimony of Candice Brown and Mrs. Johnson concerning their observations of defendant's acts of abuse was consistent with that of the expert witness in describing the manner in which the fractures were sustained. We conclude that the evidence was sufficient to authorize the fact finder to link defendant to the prior injuries.

In addition to intent, the evidence of defendant's acts of child abuse and resulting injuries are admissible as tending to show defendant's prior relationship with his son. To prove first-degree murder the State had to establish the elements of malice aforethought and premeditation. Since those elements constitute a state of mind, the State could show prior relations between the parties, including incidents of physical abuse, as bearing on defendant's quo animo. *State v. Hilleshiem*, 305 N.W.2d 710, 714 (Iowa 1981); *State v. O'Connell*, 275 N.W.2d 197, 202 (Iowa 1979); *State v. Kellogg*, 263 N.W.2d 539, 542 (Iowa 1978).

■ IV. *Testimony of Mrs. Johnson.* As part of a pretrial motion to suppress, defendant sought to exclude any adverse testimony of his spouse as privileged under section 622.7, The Code 1979. He also attempted to exclude any testimony by her as to conversations between them during their marriage under section 622.9, The Code.

After a hearing, the district court overruled both of those portions of the motion. At trial Mrs. Johnson testified against defendant and related conversations they had during the marriage. Defendant contends the district court erred in refusing to suppress this testimony.

Section 622.7 provides in relevant part, "Neither the husband nor wife shall in any case be a witness against the other, except: 1. In a criminal prosecution for a crime committed one against the other. . . ." The district court ruled that the privilege embodied in section 622.7 is inapplicable on the ground that "the murder of an infant son by the father is a crime against the mother of the child and she should be allowed to testify against her husband to the extent of her observations of any pertinent activity."

Section 622.9 provides, "Neither husband nor wife can be examined in any case as to any communication made by the one to the other while married, nor shall they, after the marriage relation ceases, be permitted to reveal in testimony any such communication made while the marriage subsisted." The district court ruled that the privilege in section 622.9 was inapplicable by virtue of section 232.74, The Code (emphasis added):

> Sections 622.7, 622.9 and 622.10 and any other statute or rule of evidence which excludes or makes privileged the testimony of a husband or wife against the other or the testimony of a health practitioner as to confidential communications, shall not apply to evidence regarding a child's injuries or the cause thereof in any judicial proceeding, civil or criminal, resulting from a report pursuant to this chapter or *relating to the subject matter of such report.*

Section 232.74 is in the division of the Iowa Juvenile Justice Code relating to child abuse reporting, investigating, and rehabilitating. That division details a procedure whereby a report of child abuse may be made to the Department of Social Services, which investigates the report and attempts to remedy the problem. When a report is made and a judicial proceeding either results from the report or relates to the subject matter of the report, section 232.74

prevents the application of any statutory or common-law marital privilege to the child's injuries or the cause of them.

In the present case a preliminary child abuse report concerning Kevin's death was filed with the Department of Social Services on July 17, 1980. A final report was filed on August 4, 1980. Both reports were filed after the child's death and after apprehension of defendant.

Defendant argues that section 232.74 is inapplicable because the proceedings against him did not result from the filing of the report. Although the proceedings did not *result from* the report, they clearly *relate to* the subject matter of the report, and they thus fall within the scope of section 232.74. We thus hold that the statutory marital privileges asserted by defendant are inapplicable in this case. We need not consider whether sections 622.7 and 622.9 would have barred Mrs. Johnson's testimony if a child abuse report had not been filed.

■ V. *Corroboration of accomplice.* During trial defendant unsuccessfully moved to dismiss the charge on the ground that his wife was an accomplice and that the State did not introduce sufficient corroboration of her testimony. He also relied in part on that ground in his motion for a new trial. In its decision of the case, acting in the place of a jury, the trial court determined that Mrs. Johnson was not an accomplice to the offense but that even if she were, her testimony was corroborated. Defendant contends that the trial court erred in both of those findings.

Iowa Rule of Criminal Procedure 20(3) states:

> A conviction cannot be had upon the testimony of an accomplice or a solicited person, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

We defined accomplice in *State v. Jennings*, 195 N.W.2d 351, 356–57 (Iowa 1972) (citations omitted):

An accomplice is a person who willfully unites in, or is in some way concerned in the commission of a crime. The general rule for determining whether a witness is an accomplice is if he could be charged with and convicted of the specific offense for which an accused is on trial.

But something more than mere knowledge that a crime is contemplated, or mere personal presence at the time and place where committed, must be shown in order to make one an accomplice. And it must be established by a preponderance of the evidence that a witness was in fact an accomplice.

See *State v. Johnson*, 237 N.W.2d 819, 822 (Iowa 1976); *State v. Houston*, 211 N.W.2d 598, 601 (Iowa 1973). "The question of who are accomplices is one of law for the court when the facts as to the witness's culpability are neither disputed nor susceptible of different inferences; when these facts are disputed or susceptible of different inferences, the question is one of fact for the [fact finder]." *State v. Sallis*, 238 N.W.2d 799, 802 (Iowa 1976).

Mrs. Johnson disclaimed any knowledge of criminal activity until checking the child at 10:00 p. m., some four hours after the fatal blows were apparently delivered. Although the record discloses that she participated in preparing the child for burial, it does not indicate that she had any role in the incident until her discovery that the child was in fact dead. Her presence in the home at the time the blows were inflicted and her past instances of child abuse are insufficient to establish, as a matter of law, that she was an accomplice. We therefore conclude that the trial court could find as a fact as it did that Mrs. Johnson was not an accomplice for purposes of rule 20(3). Hence we do not consider the trial court's finding that Mrs. Johnson's testimony was corroborated.

Defendant's assignments of error are not meritorious.

AFFIRMED.

All Justices concur except LARSON, J., who takes no part.