# IN THE COURT OF APPEALS OF IOWA

No. 13-1147
Filed October 1, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOSHUA ANDREW POWELL,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Boone County, Steven J. Oeth, Judge.

        A criminal defendant appeals from his conviction for first-degree murder. **AFFIRMED.**

        Andrew J. Boettger of Hastings, Gartin & Boettger, L.L.P., Ames, for appellant.

        Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, Daniel Kolacia, County Attorney, and Douglas Hammerand, Assistant Attorney General, for appellant.

        Heard by Potterfield, P.J., and Tabor and Mullins, JJ.

**MULLINS, J.**

Joshua Andrew Powell appeals from his conviction for the first-degree murder of his wife, Jaclyn Powell. He contends the district court erred in (1) failing to suppress his interview with law enforcement officers in violation of his right against self-incrimination and his Sixth Amendment right to counsel; and (2) submitting instructions to the jury on first- and second-degree murder without sufficient evidence of malice aforethought or premeditation. Finding that the law enforcement officers did not violate his right against self-incrimination or his Sixth Amendment right to counsel, and that there was sufficient evidence at trial to submit instructions on first- and second-degree murder, we affirm the denial of his motion to suppress and his conviction for murder in the first degree.

## I.    BACKGROUND FACTS AND PROCEEDINGS.

On October 20, 2012, Powell and Jaclyn attended a wedding in Madrid, Iowa. Before the wedding, Powell took their two children to a babysitter who lived in Ankeny. Jaclyn's mother, Sandra Goodrich, testified Powell and Jaclyn were having a good time at the beginning of the reception. Both Powell and Jaclyn were drinking and intoxicated. Later, during an interview with law enforcement officers, Powell said that for several months he had suspected Jaclyn of cheating on him with her friend, Jake Gibbons. Gibbons testified that during the wedding reception Powell approached him and asked whether Jaclyn had been at Gibbon's house on a particular night. Gibbons testified he told Powell, "No." But Jaclyn had in fact been at his house on the night in question

until early the next morning. Gibbons testified Powell did not seem upset during their conversation.

The children's babysitter, Emma Torgerson, received several text messages from Powell during the evening. Powell texted Torgerson that Jaclyn was ignoring him and having fun with everybody else. Later Powell texted he was having fun and Jaclyn did not like it. Derrek Adams testified he saw Powell and Jaclyn arguing on the dance floor. Jaclyn confronted Powell about the conversation he had with Gibbons. Adams heard Jaclyn tell Powell, "It's over. I'm done with this." Jaclyn then took off her wedding ring, handed it to Powell, and told him she wanted a divorce. Adams testified Powell's demeanor remained the same throughout the exchange: he appeared confused and "blind-sided." At about 9:15 p.m., Powell and Jaclyn left the reception early. Powell later stated they left the reception and returned to their home in Ogden so as not to make a scene.

At about 10 a.m. the following morning, the Ogden Police Department received a call from Powell reporting his wife was dead. Officer Tony Jones was one of the first officers to respond to the house. He found Powell sitting against the garage in the driveway, upset and crying. Powell stated, "I think I killed her." Jones replied, "What makes you think that?" Powell responded, "She hasn't moved since last night."

Powell explained to Jones that he and Jaclyn had been fighting. He suspected she was cheating on him and was going to leave him. Powell told Jones that Jaclyn tried to leave the house, and Powell stopped her. She then hit

him twice. Powell stated he remembered drawing his hand back in a fist to hit her and from there everything was a blur. He stated the next thing he remembered was washing blood off his hands in the bathroom sink.

Jones noted Powell had three cuts on the knuckle area of his right hand. Jones entered the house and discovered Jaclyn lying face down on the floor of the kitchen next to a sliding glass door. Blood was pooling around her face, and there was bruising around her nose, mouth, and eyes. Emergency medical personnel concluded she was dead.

Powell was transported to the Boone County Sheriff's Office where he was interviewed by Department of Criminal Investigations (DCI) Special Agent Don Schnitker and Ogden Police Chief Mick Bailey. The officers videotaped this interview, and the State played the video for the jury at trial.

During the interview, Powell explained he drove himself and Jaclyn from the reception in Madrid to their home in Ogden, a trip of about twenty to thirty minutes. As he drove, they continued "bickering." He said Jaclyn repeatedly stated the marriage was done, and that they were getting a divorce. When they arrived at the house, Jaclyn wanted to pack a bag and go back to Madrid to stay with her mother or a friend; she did not want to stay in their house that night. Powell stated that while they were in the kitchen, they had a physical struggle over her cell phone. Powell took hold of the cell phone and threw it against a cabinet, breaking it into pieces. Powell picked up the pieces and threw them outside the sliding glass door. He said Jaclyn became very upset and stated now they were "really done," and she was going to sleep at a nearby neighbor's

house. She went to the sliding glass door to walk out. Powell stated he stopped the door from opening with his hand. Jaclyn hit him in the face and attempted to open the door again. Powell stopped the door again, and Jaclyn hit him again. Powell stated he could remember then he was "kinda raring back just to hit her." He stated he had no memory of actually hitting her or any further physical contact with her. He said, "[T]he next thing I remember is I was in the bathroom washing my hands and pouring bleach on my shirt, whatever I thought that was gonna do." He further stated, "I have no idea what I did to her, you know. I know I obviously hurt her. More than hurt her." He stated that, after coming back from the bathroom, he saw her lying on the floor, checked her, and felt no pulse. He stated he panicked and packed some bags for himself and the children. He then drove to Ankeny to see his children at Torgerson's house.

Torgerson testified Powell texted her at 10:40 p.m. and asked to see his children. She estimated it takes about forty-five minutes to drive from Ogden to her place in Ankeny. Powell arrived at about 12:40 a.m. She testified she and Powell sat in her living room and talked until 3 a.m., during which Powell told her he did not know where Jaclyn was and he did not care. Torgerson noted that Powell had a cut on his right knuckle. Powell told her he had punched a car mirror because he caught Jaclyn being intimate with another man at the wedding reception. At about 3 a.m., Powell went to sleep on Torgerson's couch. Torgerson woke up at 9:45 a.m., and Powell and the children had left.

Powell's sister, Kelly Tuttle, who resided in Phoenix, Arizona at the time, testified Powell sent her a number of text and voicemail messages that morning

starting at 5:30 a.m.[1] Tuttle returned Powell's call at around 7:30 a.m.[2] Powell was crying and hysterical on the phone but would not explain why because he was in the car with the children. After he dropped the children off at Goodrich's house in Madrid, he called Tuttle back. He told Tuttle his two-year old daughter was upset, and Jaclyn would never be able to hold her babies again. Tuttle advised Powell to return to his house and call 911. Powell then went back to his house in Ogden, arriving there about 10 a.m., and placed the 911 call.

The crime scene investigation revealed a ripped men's shirt soaking in the bathroom sink and a bottle of bleach on the bathroom counter. In the master bedroom there were two partially-packed duffel bags, one filled with clothing and another with toys. Outside the house, investigators discovered pieces of Jaclyn's broken cell phone. They found more pieces inside the house.

At trial, the state assistant medical examiner explained the results of the autopsy she performed on Jaclyn. The medical examiner's conclusion was that Jaclyn's death was caused by asphyxia due to strangulation. The medical examiner testified that a person being strangled will lose consciousness in five to ten seconds. However, death from strangulation requires two to five minutes of continuous compression on the carotid arteries, cutting off blood flow to the brain. Loss of consciousness and death can take longer if there is a struggle during which the aggressor does not apply continuous force. The medical examiner found bruising on Jacyln's neck consistent with a struggle occurring during strangulation. There were also bruises on Jaclyn's upper eyelid, the left and right

---

[1] Iowa time.
[2] Iowa time.

sides of her chin, and her lower right lip. Her upper lip was scraped on the outside and had a tear going all the way through the lip. The medical examiner testified all the facial injuries were caused by blunt force injury. The medical examiner could not tell how many separate blows caused the facial injuries but estimated between one and five. Additional injuries included abrasions on Jaclyn's left shoulder, breastbone, and lower abdomen; a cluster of several bruises on her upper left arm; and a bruise on her right arm.

At trial, the court instructed the jury on first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. The jury found Powell guilty of murder in the first degree. Prior to trial, Powell moved to suppress his interview with the law enforcement officers. The district court heard this motion and denied it. Powell now appeals that decision. Powell also contends the evidence presented at trial was insufficient to justify instructing the jury on murder in the first and second degrees. He asserts this was a crime of passion and the jury should have been instructed only on voluntary manslaughter.

## II. ANALYSIS.

### A. Suppression of Powell's Statements to Law Enforcement.

The standard of review on a motion to suppress based on federal and state constitutional grounds is de novo. *State v. Lane*, 726 N.W.2d 371, 377 (Iowa 2007). We make an individual evaluation of the totality of the circumstances based on the entire record. *State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010). We give deference to the trial court's factual findings,

especially because of its opportunity to assess witness credibility, but we are not bound by those findings. *Id.* Our review includes evidence produced at the suppression hearing and the trial. *Id.*

> 1. *Whether Powell was adequately advised of his* Miranda
>
> *rights.*

Law enforcement authorities are required to advise suspects of their rights under the federal constitution before custodial interrogation pursuant to *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). *See Palmer*, 791 N.W.2d at 844. The Fifth Amendment provides a person "taken into custody or otherwise deprived of his freedom of action in any significant way" must be warned that "he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney[.]" *Miranda*, 384 U.S. at 444. Statements made under custodial interrogation are inadmissible unless there has been an adequate recitation of the *Miranda* rights and the individual has waived them. *State v. Harris*, 741 N.W.2d 1, 5 (Iowa 2007). The State bears the burden of proving the individual waived his or her rights by a preponderance of the evidence. *State v. Walls*, 761 N.W.2d 683, 685 (Iowa 2009).

An express waiver of rights is not required. *State v. Davis*, 304 N.W.2d 432, 435 (Iowa 1981). The presence of a signed form waiving constitutional rights is strong proof, but it is not alone sufficient to establish a waiver. *State v. Countryman*, 572 N.W.2d 553, 559 (Iowa 1997). We examine the individual's words and actions to determine if there was, in fact, a waiver. *Davis*, 304 N.W.2d

at 434-35. The individual's waiver must be knowing, intelligent, and voluntary. *Walls*, 761 N.W.2d at 685. For the waiver to be knowing and intelligent, it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009). To be voluntary, the relinquishment must be "the product of the suspect's free and deliberate choice rather than intimidation, coercion, or deception." *Id.* In *State v. Mann*, our supreme court found an individual's "voluntary decision to talk to the officer may clearly be implied from the fact he did so after being advised that he was not required to." 512 N.W.2d 528, 534 (Iowa 1994). Generally, an accused who has been admonished with the warnings and consequences of abandoning his constitutional rights will be considered to have given a knowing and intelligent waiver. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).

When Powell was brought to the sheriff's station, he was interviewed by DCI Special Agent Schnitker and Ogden City Police Chief Bailey. They had the following conversation at the beginning of the interview:

> **SCHNITKER**: [I]f it's all right with you I'd like to sit down and go over some things with you and kinda figure out what happened.
> **POWELL**: And I've never been through this, other than. . .
> **SCHNITKER**: Yeah, we'll take it slow.
> **POWELL**: . . . the TV for. . . uh. . . .
> **SCHNITKER**: You know, it's always. . . yeah, it's always. . .
> **POWELL**: . . . do I need to. . .
> **SCHNITKER**: . . . important. . . there's always two sides to things, you know, and . . . and, you know, I'm married and I know how things go. Uh . . . you know, and that's kind of what we wanna figure out 'cause . . . uh . . . uh . . . you know . . . uh . . . now's the time to do that.
> **POWELL**: It is . . . I guess before we get started, my biggest question, I don't . . . is it my interest to have an attorney. . .

**SCHNITKER**: That's . . .

**POWELL**: . . . or do I need one, I . . .

**SCHNITKER**: . . . definitely up to you.

**POWELL**: I don't. . .

**SCHNITKER**: And I can go over those with you. So I mean you always have the right to an attorney, I mean you can . . . uh . . . ask for an attorney any time . . . uh . . . you can have that attorney now if you want it while we're doing the questioning or you can get one later, you know, they're free of cost if you can't afford one. Uh. . . it's totally up to you. Uh . . . like I said, my goal today is just to get your side of the story. Uh . . . I mean, we know what happened, you called 911 . . . uh . . . now I'm just trying to get the details 'cause I think that's important. But, you know, we can sit down for awhile if you wanna . . . uh . . . if you like how things are going, continue, if you don't we can stop at any time. I mean that's your rights, so.

**POWELL**: Okay.

**SCHNITKER**: However you wanna go.

**POWELL**: I got nothing to hide. I just don't know it's, you know, in my best interest.

**SCHNITKER**: Right. That's something you gotta think about. I mean, like I said, I . . . I've done this a lot . . . uh . . . and I know that, you know, we got our crime scene people down there doing their thing now and, you know, and the goal is to put the pieces together. . . .

. . . .

[Y]ou wanna explain what's going on to me, kinda talk . . . talk me through it, talk me through your relationship?

**POWELL**: Yeah. That's fine.

**SCHNITKER**: Yeah?

**POWELL**: Uh . . . uh. . . . (UNINTELLIGIBLE)

**SCHNITKER**: Okay. And we've met before.

**BAILEY**: I'm Mick Bailey, I'm chief of police of. . .

**SCHNITKER**: That's right.

**BAILEY**: . . . Ogden.

**SCHNITKER**: Okay. Uh . . . you want Mick in here or you want to just talk you and I; it's up to you, so.

**BAILEY**: It . . . it doesn't matter to me.

**SCHNITKER**: Okay. All right. Well I'm gonna take some notes, okay, 'cause I don't know . . . and again . . . uh . . . if I'm not clear . . . uh . . . I'm with the DCI. You know what that is?

**POWELL**: Yeah, Department of Criminal Investigations.

**SCHNITKER**: Yeah, you bet. And what I do is . . . uh . . . I help out local departments . . . uh . . . in cases like this. You know, a lot of times . . . uh . . . officers in . . . in town know everybody personally; I don't know you at all . . . uh . . . that gives me a little bit

of . . . uh . . . uh . . . ground to kinda sit down and talk with you and . . . and, you know, I don't have any vested interest, you know, and I'm just sitting across from you today, and you don't know me but I just want to be clear who I am, okay. All right. And we kinda talked through this . . . uh . . . but I want you to keep this because, like I said, there's no tricks with me, all right . . . uh . . . these are your rights and, like I said, any time you don't like what I'm saying, you think I'm being rude to you, you can stop, okay. Uh . . . but kinda what I talked about, you have the right to remain silent . . . uh . . . anything you say can and will be used against you in a court of law, of course. Have the right to consult with a lawyer before answer any questions or make any statements, have that lawyer present during questioning. If you can't afford a lawyer, one will be set up for you from the county. Uh . . . these rights are good for now and they're good for 15 minutes from now, they're good for, you know, whenever you're sitting down talking with somebody. You understand those?

**POWELL**: I think so.

**SCHNITKER**: Okay. And . . . uh. . . you know, we'll take it slow. I'm not gonna push you at all, but . . . uh . . . I'll let you hang on to this, if you just wanna sign there saying that you understand that . . . uh . . . we'll get started. How long you guys been together?

**POWELL**: Together . . . basically six years.

**SCHNITKER**: Okay.

**POWELL**: Seven.

**SCHNITKER**: Yeah, I've been married nine years myself, so.

**POWELL**: We were . . . we were married for it'd been five years next July.

**SCHNITKER**: Okay.

**POWELL**: Uh . . . yeah, this all . . . I don't know. Said I . . . I got nothing to hide, but it just still makes me nervous, I guess.

**SCHNITKER**: Okay. W . . . as long as you're clear, that's just saying that you're clear with your rights, it doesn't mean that you're signing that you did anything; that just says that you know that . . . what's going on and that . . . uh . . . uh. . .

**POWELL**: Any t . . . even after signing this, any time I can go back and ask for. . .

**SCHNITKER**: Y . . . you just tell. . .

**BAILEY**: Yeah.

**SCHNITKER**: . . . y . . . you tell. . .

**BAILEY**: Yeah.

**SCHNITKER**: . . . me and I don't. . .

**BAILEY**: Th . . . this is just a . . . the whole basically thing is that he read you your rights; it's called the Miranda. And you're just

signing there saying that you do understand what he told you, and then if there's something that comes up. . .

    **SCHNITKER**:  and I'm here . . .
    **BAILEY**:  . . . at any time . . .
    **SCHNITKER**:  And I'm here just for the back story, Josh, I mean we know what . . . what went down, we just don't know why, so.  But . . . uh . . . so you've been married six years, you said?

Schnitker gave Powell a form labeled "Statement of Rights and Acknowledgment and Waiver".  The form states:

> STATEMENT OF RIGHTS
> Before you answer any questions or make any statements, you must fully understand your rights.
>     1.  You have the right to remain silent.
>     2.  Anything you say can and will be used against you in a court of law.
>     3.  You have the right to consult with a lawyer before you answer any questions or make any statement and to have a lawyer present during questioning.
>     4. If you cannot afford a lawyer, one will be provided for you, free of cost if you want one.
>
> ACKNOWLEDGMENT AND WAIVER OF RIGHTS
> After the warning and in order to secure a waiver, the following questions should be asked and an affirmative reply secured to each questions.
>     1.  Do you understand each of these rights I have explained to you?
>     2.  Having these rights in mind, do you wish to talk to us now?
>
>                          _____
>                              Signature

Powell read and signed the form.[3]  Powell then spoke with the law enforcement officers for about two hours.  In substance, he repeated the statements he

---

[3] The form instructs the officer to ask and obtain an affirmative reply to each question. The officers in this case did not, however, directly ask Powell those questions.  Neither does the form provide "yes" or "no" options by which Powell could indicate his response to the questions in writing.

already made spontaneously to Officer Jones that morning outside his house and prior to being placed in custody.  After about two hours, Powell and the officers had the following exchange:

> **POWELL**:  What I should do is talk to an attorney.
> **SCHNITKER**:  You should've asked.  That what you wanna do?
> **POWELL**:  I should've from the start.
> **SCHNITKER**:  I just need to be clear, Josh; if that's what you wanna do I can get you an attorney or I . . . I get you a phone call; if you want me to continue, I will.  Like I said, I wanna be clear because I . . . I'm not sure you were clear.
> **POWELL**:  I agree (UNINTELLIGIBLE)
> **SCHNITKER**:  I'm sorry?  (UNINTELLIGIBLE)
> **POWELL**:  I said I agree  (UNINTELLIGIBLE)
> **SCHNITKER**:  Right.  'Cause I . . . I have nothing else to do but talk with you today, Josh, and . . . and I'll . . . I'll spend as much time with you as you want to spend with me.  I mean it's not gonna change the facts.  If . . . if . . . if you want to get an attorney you can do that, too.  I mean it is what it is.  But you're the one that gets to make that decision, not me.  And I know the questions I've been asking you might not like, but the questions, I feel, are important.  Questions that I know the . . . the answers are gonna be told to me by other people.
> (brief pause)
> **POWELL**:  Think I should probably talk to an attorney.
> **SCHNITKER**:  Okay.

Schnitker then gave Powell his business card and terminated the interview.

Powell argues the law enforcement officers failed to provide him an adequate description of his *Miranda* rights prior to engaging in custodial interrogation.  He asserts the officers "massaged" the presentation of the waiver form and the rights in the form without presenting them in a clear and intelligible fashion "in a coercive attempt to get [Powell] to talk."  Therefore, he argues, he was not fully aware of the nature of the rights and the decision to forgo them was not the product of his free and deliberate choice.

Powell argues the officers "massaged" the presentation of his *Miranda* rights essentially by interspersing personal questions and downplaying the interrogative nature of the interview. To "massage" in this context means "to manipulate, organize, or rearrange (data, figures, or the like) to produce a specific result, especially a favorable one." Massage Definition, Dictionary.reference.com, http://dictionary.reference.com/browse/massage?s=t (last visited Aug. 20, 2014). Although not precisely at the outset of the interview, Schnitker did state the rights verbally to Powell and gave him the waiver form containing the rights in writing. Schnitker gave a clear recitation of the rights, repeating them almost verbatim from the waiver form. Nothing in the discussion preceding or during the recitation of the rights indicates an attempt to manipulate, organize, or rearrange the language in such a way as to render the rights unclear or unintelligible. Even if the verbal recitation of the rights had been unclear, the statements declaring the rights on the written form were concise, simple, and clear. Powell read and signed this form. Powell's statement at the end of the interview that he should have asked to speak to an attorney "from the start" shows he understood his rights.

Powell insists, however, the decision to waive his *Miranda* rights was not the product of his free and deliberate choice. Powell did read and sign the waiver form. This alone is not conclusive proof of the validity of his waiver. *Countryman*, 572 N.W.2d at 559. However, he also spoke with the law enforcement officers for almost two hours after being advised that he need not do so. His words and actions subsequent to being advised of his rights indicate he

in fact waived his rights. *See Mann*, 512 N.W.2d at 534. There is also no evidence in the interrogation transcript of intimidation, coercion, or deception regarding his rights that would have deprived Powell of the ability to make a free and deliberate choice to forego the *Miranda* rights and speak to the officers. Accordingly, we find the recitation of the rights was adequate, and Powell waived his Fifth Amendment right against self-incrimination by speaking with the officers even though he knew he had the right to refuse to answer and had the right to an attorney.

*2.      Whether Powell was denied the right to counsel.*

Powell next argues his statements at the beginning of the interview questioning whether he needed an attorney constituted an invocation of the Sixth Amendment right to counsel. Relying on his involuntary waiver argument, Powell asserts he did not have a clear understanding of the Sixth Amendment right he was waiving.

If an interrogation takes place after the attachment of the Sixth Amendment right to counsel, the Sixth Amendment affords a right to counsel that is independent of the right to counsel provided by the Fifth Amendment for individuals undergoing custodial interrogation. *State v. Johnson*, 318 N.W.2d 417, 432 (Iowa 1982). To determine whether a statement has been obtained in violation of the Sixth Amendment right to counsel, we must first determine whether the Sixth Amendment right to counsel had attached at the time of the statement. *Id.* at 426. The Sixth Amendment right to counsel attaches "at the time that adversary judicial criminal proceedings are initiated against a person,

whether by way of formal charge, arraignment, preliminary hearing, information, or indictment." *Id.* at 432. In the State of Iowa, a criminal proceeding for an indictable offense is commenced when the State files a trial information or indictment to prosecute the case, and under some circumstances upon the filing of a complaint. *Id.* at 432-35.

Here, the custodial interrogation occurred on October 21, 2012. However, the complaint was filed on October 22, 2012; the trial information was filed on October 30, 2012. At the suppression hearing, the law enforcement officers agreed Powell was in custody on October 21, and had been given his *Miranda* rights. However, they testified he was not yet under arrest and no charges had been filed. Prior to the State filing charges, the Sixth Amendment right to counsel had not yet attached. Therefore, the district court did not deny the motion to suppress erroneously. We affirm the denial of that motion.[4]

**B.      Sufficiency of Evidence to Warrant Submission of Jury**

**Instructions on Murder in the First and Second Degrees.**

We review sufficiency of the evidence issues for correction of errors at law. *State v. Randle*, 555 N.W.2d 666, 671 (Iowa 1996). We uphold a finding of guilt if the verdict is supported by substantial evidence. *State v. Henderson*, 696 N.W.2d 5, 7 (Iowa 2005). Evidence is substantial if a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.* We consider all

_____

[4] As Powell makes no such argument, we do not address whether his statements at the beginning of the interview invoked the right to counsel under the Fifth Amendment.

evidence in the case, including that which detracts from the verdict. *Id.* We view the evidence in the light most favorable to the State. *Id.*

"A person who kills another person with malice aforethought either express or implied commits murder." Iowa Code § 707.1 (2011). First-degree murder occurs when a person "willfully, deliberately, and with premeditation kills another person." Iowa Code § 707.2(1)(a). "A person commits murder in the second degree when the person commits murder which is not murder in the first degree." Iowa Code § 707.3. Powell contends there was insufficient evidence of malice aforethought to instruct the jury on murder. He also contends there was insufficient evidence of premeditation to instruct the jury on first-degree murder. He claims this was a crime of passion and the evidence justified only an instruction on voluntary manslaughter, not murder.

*1.     Evidence of malice aforethought.*

Powell contends the evidence at trial was insufficient to establish he acted with malice aforethought. He states he preserved this issue for review by raising it in his motion for judgment of acquittal at the close of the State's case and renewing it in post-trial motions. Our supreme court has repeatedly said, "[W]hen the motion for judgment of acquittal does not make reference to the specific elements of the crime on which the evidence was claimed to be insufficient, it [does] not preserve the sufficiency of the evidence issue for review." *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005). Powell's motion for judgment of acquittal raised the claim that there was insufficient evidence of premeditation. On his post-trial motions, he renewed the claim with regard to premeditation and

also claimed there was insufficient evidence of malice aforethought. Because he failed to raise the malice aforethought claim on the motion for judgment of acquittal, Powell did not preserve it and we do not address it.

*2.    Evidence of premeditation.*

Powell contends there was little to no evidence of premeditation to warrant a jury instruction on first-degree murder. With regard to first-degree murder the instructions provided:

> The State must prove all of the following elements of Murder in the First Degree:
> 1.    On or about the 20th day of October, 2012, the Defendant strangled Jaclyn Powell.
> 2.    Jaclyn Powell died as a result of being strangled.
> 3.    The Defendant acted with malice aforethought.
> 4.    The Defendant acted willfully, deliberately, premeditatedly, and with specific intent to kill Jaclyn Powell.
> If the State has proved all of the elements, the Defendant is guilty of Murder in the First Degree. If the State has failed to prove any one of the elements, the Defendant is not guilty of Murder in the First Degree, and you will then consider the charge of Second Degree Murder.

The instructions provided that to premeditate means "to think or ponder upon a matter before acting." With regard to determining specific intent, the instructions stated:

> Because determining the Defendant's specific intent requires you to decide what he was thinking when the act was done, it is seldom capable of direct proof. Therefore, you should consider the facts and circumstances surrounding the act to determine the Defendant's specific intent. You may, but are not required to, conclude a person intends the natural results of his acts.
> Deliberation and premeditation need not exist for any particular length of time before the act.

"Premeditation may be shown through evidence of (1) activity by the defendant to plan the killing, (2) motive based on the relationship between the defendant and

the victim, or (3) the nature of the killing, including the use of a deadly weapon combined with an opportunity to deliberate." *State v. Buenaventura*, 660 N.W.2d 38, 48 (Iowa 2003). Powell argues the evidence shows he did not appear to be angry at the wedding reception when Jaclyn told him she wanted a divorce and he only hit her once, thus, there was no time to think or ponder upon murder.

Although Powell did not appear angry at the wedding reception, he and Jaclyn left early and no one saw either of them after they left until Powell went to Torgerson's apartment later that night. Powell admitted they continued to argue and a physical struggle occurred where he broke Jaclyn's cell phone. Jaclyn wanted to leave the house and go to a neighbor's house for the night, but Powell prevented her from leaving through physical force. He admitted he punched her at least once. Although the record discloses no activity in advance of the strangulation to plan a killing, evidence of the breakdown of their marriage and Jaclyn's declaration that she wanted a divorce show a motive for Powell's acts and for the killing. A reasonable jury could find that the end of the marriage was a motive contributing to a finding that the killing was premeditated.

The medical examiner testified the injuries Jaclyn sustained on her face could have been inflicted by between one and five separate blows. Powell claimed he could only remember one blow, but a reasonable jury could conclude there was sufficient time between multiple blows to consider the matter and stop the attack. The physical evidence also suggested Jaclyn struggled as he was strangling her, lengthening the estimated five to ten seconds before she fell unconscious and the estimated two to five minutes before he strangled her to

death.  Even after she fell unconscious and stopped struggling, Powell would have had to maintain continuous force on her throat for several minutes before she died.  If Powell's goal at the time was simply to incapacitate Jaclyn so she would not leave, he would have stopped choking her after she had fallen unconscious and was not struggling.  He continued choking her for several minutes until she died of asphyxiation.  These facts are sufficient to generate a jury question.  A reasonable jury could conclude those minutes provided ample time for Powell to ponder the purpose and likely consequences of his actions.  Accordingly, the manner of the killing—including the time it took to effectuate death—could also have convinced a reasonable jury that Powell's acts were premeditated.  We conclude, therefore, sufficient evidence supports the finding Powell acted with premeditation.  The district court properly submitted the first-degree murder instruction to the jury.

**III.    Conclusion.**

We find the law enforcement officers did not violate Powell's right against self-incrimination or his Sixth Amendment right to counsel during their custodial interrogation.  Therefore, the district court did not err in denying his motion to suppress the interrogation transcript.  We also find the evidence presented at trial was sufficient to support instructing the jury on first- and second-degree murder.  Accordingly, we affirm the conviction.

**AFFIRMED.**